**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4941-18
      A-5095-18
      A-1452-19

STATE OF NEW JERSEY,

   Plaintiff-Respondent,

v.

EBENEZER BYRD, a/k/a
EBERNEZER BYRD,
E.B. BYRD,
EBENEZER BIRD,
DONALI BYRD, and
DANALL JOHNSON,

   Defendant-Appellant.

_____

STATE OF NEW JERSEY,

   Plaintiff-Respondent,

v.

JERRY J. SPRAULDING,
a/k/a GERRY SPRAULDING,
JERRY SPRAULDING,
GERALD J. SPRAULDING,
JERRY BATTER,

MICHAEL HARRIS,
MARK LOVE, and
GERALD SPAULDING,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GREGORY A.
JEAN-BAPTISTE, a/k/a
GREGORY JEAN BAPTIST,
GREGORY BAPTITE,
and GU JEAN,

     Defendant-Appellant.

_____

          Argued (A-4941-18 and A-5095-18) and Submitted (A-1452-19) November 30, 2022 – Decided May 20, 2024

          Before Judges Haas and Gooden Brown.

          On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment Nos. 16-04-0718 and 18-06-0809.

          Stephen William Kirsch, Designated Counsel, argued the cause for appellant Ebenezer Byrd in A-4941-18 (Joseph E. Krakora, Public Defender, attorney; Stephen William Kirsch, on the briefs).

          Margaret Ruth McLane, Assistant Deputy Public Defender, argued the cause for appellant Jerry

Spraulding in A-5095-18 (Joseph E. Krakora, Public Defender, attorney; Margaret Ruth McLane, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Gregory A. Jean-Baptiste in A-1452-19 (Andrew Robert Burroughs, Designated Counsel, on the briefs).

Daniel Ian Bornstein, Deputy Assistant Prosecutor, argued the cause for respondent in A-4941-18 and A-5095-18 (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Maura Kathryn Tully, Assistant Prosecutor, of counsel and on the briefs).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent in A-1452-19 (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, P.J.A.D.

Following a months-long joint jury trial conducted in 2019, defendants Ebenezer Byrd, Jerry Spraulding, and Gregory Jean-Baptiste were convicted of first-degree felony murder and related offenses stemming from the 2009 brutal beating and fatal shooting of Jonelle Melton in her Neptune City apartment. James Fair was indicted along with defendants but pled guilty to a related conspiracy charge prior to defendants' trial. At trial, the State's proofs included DNA evidence placing Jean-Baptiste in Melton's apartment and an unindicted

co-conspirator's testimony that supported the State's theory that defendants had set out to rob Melton's neighbor, a suspected drug dealer who kept upwards of sixteen-thousand dollars in his freezer. Instead, they mistakenly broke into Melton's apartment. Melton was a fifth-grade school teacher who lived alone.

Byrd was sentenced to life in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He also received two consecutive twenty-year terms, each with a ten-year period of parole ineligibility, and a consecutive five-year term, all for witness tampering charges. Spraulding received a life term, subject to NERA. Jean-Baptiste received an aggregate term of life plus twenty years, with an eighty-five percent period of parole ineligibility and a ten-year period of parole ineligibility, respectively. Jean-Baptiste's sentence was also consecutive to sentences he was already serving on unrelated indictments.

In these back-to-back appeals, which we consolidate for purposes of issuing a single opinion, defendants assert multiple trial errors. They variously raise evidentiary issues, question the trial court's handling of a juror issue, challenge several jury instructions, dispute the denial of a motion for judgment of acquittal, invoke ineffective assistance of counsel claims, and contest their sentences as excessive.

Specifically, Byrd raises the following points for our consideration:

POINT I

OUT-OF-COURT STATEMENTS BY JAMES FAIR IN WHICH HE TOOK RESPONSIBILITY FOR KILLING THE VICTIM, ACTING WITH OTHERS WHO WERE NOT THE DEFENDANT OR THE CODEFENDANTS, WERE ADMISSIBLE AS EVIDENCE OF THIRD-PARTY GUILT AND THE JUDGE COMMITTED REVERSIBLE ERROR IN EXCLUDING THEM.

POINT II

THE STATE USED IMPROPER OPINION TESTIMONY OF AN EXPERT WITNESS AND OF LAY WITNESSES TO BOLSTER ITS THEORY OF THE CASE REGARDING THE ULTIMATE ISSUE FOR THE JURY TO DECIDE, AND ON MATTERS CLEARLY NOT BEYOND THE KEN OF THE AVERAGE JUROR. (NOT RAISED BELOW).

POINT III

NUMEROUS JURY INSTRUCTIONAL ERRORS TAINTED THE VERDICT IN THIS CASE. (NOT RAISED BELOW).

A. The Jury Instruction for Robbery Omitted an Explanation of Attempted Theft. (Not Raised Below).

B. The Improper Use of "And/Or" Language, or The Functional Equivalent, in The Instructions. (Not Raised Below).

A-4941-18

C. The Instruction on [The Undicted Co-Conspirator's] Testimony. (Not Raised Below).

D. The Instruction on Witness Tampering Omitted Any Reference to Accomplice Liability. (Not Raised Below).

POINT IV

IN THE PHASE-TWO TRIAL FOR "CERTAIN PERSONS" WEAPONS POSSESSION, DEFENDANT WAS DENIED THE EFFECTIVE REPRESENTATION OF COUNSEL WHEN HIS ATTORNEY LITERALLY DID NOTHING TO DEFEND HIM. (NOT RAISED BELOW).

POINT V

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

In a supplemental brief, Byrd adds the following point:

THE DEFENDANT'S RIGHTS TO DUE PROCESS AND AN IMPARTIAL JURY WERE VIOLATED WHEN THE COURT RECEIVED INFORMATION MID-TRIAL THAT JUROR [NO.] 8 HAD "ALREADY DECIDED SHE'S GOING TO FIND THEM ALL GUILTY AND GOING TO BURN THEIR ASSES," AND THE JUDGE FAILED TO CONDUCT AN ADEQUATE INDIVIDUAL VOIR DIRE OF THAT JUROR, AND FAILED TO CONDUCT ANY VOIR DIRE OF THE REST OF THE JURORS.

Jean-Baptiste raises the following points for our consideration:

POINT I

6

THE TRIAL COURT PREJUDICIALLY ERRED WHEN IT RULED INADMISSIBLE CERTAIN EXCULPATORY OUT-OF-COURT STATEMENTS MADE BY JAMES FAIR AND [HIS ASSOCIATE,] KEVIN BROWN, AS THE COURT'S MISAPPLICATION OF N.J.R.E. 803 (C) (25) DENIED DEFENDANT A COMPLETE THIRD-PARTY GUILT DEFENSE.

POINT II

THE TRIAL COURT PREJUDICIALLY ALLOWED THE STATE TO RELY UPON IMPERMISSIBLE LAY AND EXPERT OPINION TESTIMONY AS TO THE ULTIMATE QUESTION OF GUILT.

(A) Lay Witness Testimony. (Not Raised Below).

(B) Expert Witness Testimony.

POINT III

THE TRIAL COURT ERRED WHEN IT ALLOWED CO-DEFENDANT'S COUNSEL TO ELICIT PREJUDICIAL OTHER CRIMES EVIDENCE FROM [THE UNINDICTED CO-CONSPIRATOR] OVER DEFENDANT'S OBJECTION.

POINT IV

THE TRIAL COURT PREJUDICIALLY ERRED WHEN IT GRANTED THE STATE'S MOTION TO READ INTO THE RECORD CERTAIN STATEMENTS MADE BY [THE UNINDICTED CO-CONSPIRATOR] AS PRIOR CONSISTENT STATEMENTS WHICH SERVED ONLY TO

7

BOLSTER THE STATE'S WITNESS AND THEREBY ALLOWED IMPERMISSIBLE OTHER CRIMES EVIDENCE TO BE PRESENTED TO THE JURY.

POINT V

IT WAS REVERSIBLE ERROR WHEN THE TRIAL COURT FAILED TO PROPERLY <u>VOIR DIRE</u> JUROR NUMBER 8 AND THE JURY AFTER IT LEARNED THAT JUROR 8 HAD ALREADY DECLARED DEFENDANT GUILTY BEFORE DELIBERATIONS AND HAD BEEN RESEARCHING ARTICLES ABOUT THE CASE.

POINT VI

THE TRIAL COURT'S INCOMPLETE AND ERRONEOUS JURY INSTRUCTIONS DENIED DEFENDANT A FAIR AND RELIABLE TRIAL.

(A) The Trial Court Erred When It Failed To Instruct The Jury On Attempted Theft. (Not Raised Below).

(B) The Trial Court Erred When It Failed To Provide The Jury With A "False-In-One, False-In-All" Charge.

(C) The Trial Court's Use Of "And/Or" Language In The Jury Instruction Was Confusing And Could Have Reasonably Led The Jury To Non-Unanimous Verdicts. (Not Raised Below).

(D) The Trial Court Prejudicially Erred In Its Instruction As To The Burden Of Proof Related To [The Unindicted Co-

Conspirator's] Testimony.   (Not Raised Below).

POINT VII

AS·THERE WAS INSUFFICIENT EVIDENCE TO PROVE THAT DEFENDANT HAD ENGAGED IN FIRST-DEGREE WITNESS TAMPERING, THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL.

POINT VIII

THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR TRIAL.   (NOT RAISED BELOW).

POINT IX

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

Spraulding raises the following points for our consideration:

POINT I

THE TRIAL COURT'S FAILURE TO CONDUCT ADEQUATE VOIR DIRE AFTER LEARNING MID-TRIAL THAT A JUROR HAD ALREADY DECIDED THAT THE DEFENDANTS WERE GUILTY AND WAS "GOING TO BURN THEIR ASSES" REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT II

9                                              A-4941-18

THE ERRONEOUS EXCLUSION OF A THIRD-PARTY'S STATEMENTS TAKING RESPONSIBILITY FOR KILLING THE VICTIM REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT III

THE ADMISSION OF IMPROPER LAY AND EXPERT TESTIMONY REQUIRES REVERSAL. (NOT RAISED BELOW).

A. Lay Opinion Testimony

B. Expert Opinion Testimony

POINT IV

NUMEROUS JURY INSTRUCTION ERRORS REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS. (NOT RAISED BELOW).

A. The Court Erroneously Failed To Instruct The Jury On Attempted Theft.

B. The Use of "And/Or" Language Was Confusing And Could Have Led To Non-Unanimous Verdicts.

C. The Court Lessened The Burden Of Proof With Its Instruction on [The Unindicted Co-Conspirator's] Testimony.

D. The Court Improperly Took "Judicial Notice" Of An Element of The Certain Persons Charge.

POINT V

A-4941-18

THE LIFE-TERM SENTENCE IS EXCESSIVE.

Having reviewed the points raised in light of the voluminous record and the governing legal principles, we affirm the convictions and sentences.

I.

On April 25, 2016, Monmouth County Indictment No. 16-04-718 charged Byrd, Spraulding, Jean-Baptiste, and Fair with second-degree conspiracy to commit armed burglary, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:18-2 (count one); second-degree armed burglary, N.J.S.A. 2C:18-2 (count two); first-degree armed robbery, N.J.S.A. 2C:15-1 (count three); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six). Count seven of the indictment charged Byrd and Jean-Baptiste with first-degree witness tampering, N.J.S.A. 2C:28-5(a); and counts eight and nine separately charged Byrd and Spraulding with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1). Elizabeth Pinto was named as an unindicted co-conspirator in counts one through six. In a separate indictment, No. 18-06-809, Byrd was charged with an additional count of first-degree witness tampering,

N.J.S.A. 2C:28-5(a) (count one); and one count of third-degree witness tampering, N.J.S.A. 2C:28-5(a) (count two).

On November 2, 2017, co-defendant Fair entered a negotiated guilty plea to count one of Indictment No. 16-04-718 (conspiracy to commit armed burglary). He was sentenced in accordance with the plea agreement to ten years in prison, subject to NERA, to be served concurrently with a sentence imposed on an unrelated indictment. Byrd's, Spraulding's, and Jean-Baptiste's joint jury trial on counts one through seven of Indictment No. 16-04-718 and counts one and two of Indictment No. 18-06-809 began on January 17, 2019, and concluded on March 12, 2019. The State produced forty-one witnesses, including civilians and law enforcement personnel. Fair did not testify at the trial, but Pinto did. We glean these facts from the trial record.

In 2008, following her separation from her husband and fellow Red Bank Middle School teacher, Michael Melton, Jonelle[1] was living alone in apartment 208-A in the Brighton Arms apartment complex in Neptune City. Michael testified that he and Jonelle maintained a good relationship and spoke to each

---

[1] Because of the common surname, we use first names to avoid confusion and intend no disrespect.

other daily. On the morning of September 14, 2009, Jonelle did not show up for work. As a result, the school secretary asked Michael to check on her.

Michael testified that he drove to Jonelle's apartment and went inside when he found the front door unlocked. Once inside, he found Jonelle "laying . . . on the floor by the bed," next to a broken table. Believing Jonelle had fallen and was unconscious, Michael called 911. However, when he attempted to check Jonelle's pulse, he noticed blood on and around her neck, and duct tape on her wrist. Michael moved the tape to check her vitals.

Neptune City Police Officer Michael Vollbrecht was the first officer to respond to the scene. After he examined Jonelle, who was completely unresponsive and "cold to the touch," he informed Michael that she was dead. According to Vollbrecht, Jonelle's "bedroom was in disarray. There was clothing on the floor and small furniture knocked over." Neptune City Police Sergeants John Rose and Hoover Cano were next to arrive at the scene. Both Vollbrecht and Cano observed evidence of a struggle and noted that the kitchen cabinets, refrigerator doors, and living room's sliding glass door "were open."

Monmouth County Prosecutor's Office (MCPO) Detective Shannon Kavanaugh, who was qualified without objection as an expert in "the field of crime scene processing" and "fingerprinting" analysis, testified that there was

13

"no sign[] of forced entry" at the front door of the apartment, but there was "blood transfer" near the deadbolt and on the door frame. Kavanaugh said that the screen was cut from a window in the rear of the apartment, allowing someone "to pop the lock and open the window . . . without breaking the glass." Kavanaugh described it as the "point of entry." Underneath the window was a chair with "a few" "dusty partial footwear impression[s]." A lighter was also found on the ground by the chair.

Kavanaugh opined that there had been three intruders in Jonelle's apartment, and "probably two" entered through the window. Kavanaugh believed "that someone crawled in first," possibly unwittingly dropping the lighter from a pocket, and "that the chair was then pushed to the window," allowing "a second person" to come inside. According to Kavanaugh, "the third person was let in through the sliding glass door." Noting that "vegetation" and soil were found in the hallway leading to the bedroom, Kavanaugh opined that the three intruders encountered Jonelle in her bedroom after entering the apartment.

Kavanaugh testified that the open kitchen cabinet, refrigerator, and freezer doors "stood out to [her]" because it appeared as if the intruders "were in there searching for something." She also noted that many potential valuables,

including jewelry, a laptop, and a TV, were not taken from the apartment.  A torn latex glove was located under Jonelle's left wrist, and a latex glove was found behind the rear patio of Jonelle's apartment.  There was also "a piece of used duct tape" on the hallway floor, just outside Jonelle's bedroom.  Kavanaugh commented that there were "tremendous signs of struggle" in the bedroom, consistent with "the violent nature of what was done to th[e] victim." Kavanaugh observed overturned furniture, items strewn about, and blood spatter throughout the bedroom.  Kavanaugh believed the intruders "exited through the front."

An autopsy revealed that Jonelle suffered numerous "blunt force traumatic injuries" and "sharp force injuries."  Her jaw was broken in two places and she had cuts on her scalp, right temple, above her right ear, and on her cheek and lips, as well as bruises on both arms, her right leg, and her face.  Jonelle was shot twice, once in the right shoulder and once in the back of the head.  The latter was the fatal shot.  The medical examiner estimated that Jonelle died between 1:00 a.m. and 5:00 a.m. on September 14, 2019.

A witness who lived in the apartment above Jonelle's testified that he woke up at around 4:00 a.m. on September 14, 2009, when his dog started barking. He heard "muffled noises," that "sounded like maybe things being moved

15

around." He also heard a "metallic clang" that sounded like "a metal object" being dropped "on the floor." Another neighbor, who lived on the first floor near Jonelle's apartment, testified that she was awakened that morning when her two dogs started barking at the rear sliding door around 2:30 or 3:00 a.m. The witness looked out the sliding doors and saw "a black male" with "[s]hort hair" wearing "all black clothing" standing "at the corner of the building directly behind [her] building." She described the man as about twenty-eight to thirty-one years of age, "anywhere from" 5' 10" to 5' 11" in height, and "solid" in size but "not by being fat." The witness watched the man standing there for about fifteen minutes before she left to use the bathroom. When she returned, the man was gone.

Initially, police investigated Michael, who was the beneficiary of Jonelle's life insurance policy, as a possible suspect. However, police ruled him out as a suspect once his alibi that he had not left his girlfriend's house on the night of the murder was confirmed. Cano, who was the lead Neptune City detective, further explained that Michael "was very cooperative," "his phone records were all corroborated," and "he had a good relationship with Jonelle, even though they were in the process of getting divorced." Police also investigated Jason Davis, the boyfriend of Jonelle's close friend and co-worker. Davis had called Jonelle

16

the night of the murder. However, Cano testified that he also ruled Davis out as a suspect because there were "no forensics" or "witnesses . . . linking him to the crime scene," and he remained "cooperative" throughout the investigation.

The case remained unsolved for some time. Eventually, through investigative leads, law enforcement identified Byrd (a.k.a. "E.B."), Spraulding (a.k.a. "B. Me"), and Jean-Baptiste (a.k.a. "G.U.") as suspects based on a theory that they had mistakenly broken into "the wrong apartment" to rob the occupant, David James, whom they believed was a cash-flush drug dealer. When the murder occurred in 2009, James, also known as "Munch," was living in Apartment 206-A with his then-girlfriend, Alicia Stewart, and her son. James testified that, at the time, he kept sixteen- to twenty-thousand dollars "in a French toast box" inside a "[s]mall chest freezer" in his "kitchen." At trial, James denied selling drugs, testifying that he made a living as an independent tractor trailer truck driver. He stated that he needed large sums of cash "to keep [his] business running," and that he did not keep the money in a bank to avoid "child support" seizures.

Sometime around the summer of 2009, James and Stewart broke up. Stewart had been staying with her friend Raven Alston for about a month, but went to spend the night at James's apartment when she and Alston had a fight.

17

Stewart testified that she found the cash in James's freezer that night while "snooping around." Later that summer, at a house party at Alston's friend's house, Stewart told Alston about the money after Alston heard Stewart arguing on the phone with James and telling James, "if I wanted anything from you, I know your money [is] in the deep freezer."

Fair, whom Stewart and Alston knew as "Dough Boy," also attended the house party and later "announced that he heard" Stewart's phone call with James. According to Stewart, sometime later, she was at her friend Jazmine Aviles's house when Fair called Aviles to ask where James lived. Aviles also lived in the Brighton Arms apartment complex. Phone records confirmed Fair's call to Aviles. After Aviles refused to tell Fair the address, Fair showed up at Alston's door, asking Alston where Stewart and James lived and "what's up with the money." Alston described Fair's inquiry as "weird" because he had never come to her house before. Alston refused to tell Fair where they lived. However, after Jonelle's murder, Alston asked Fair about the incident because "it just was weird to [her] that someone would randomly be killed in the Brighton Arms" after Fair had been "trying to get the address to the house." Alston testified that Fair denied involvement in Jonelle's murder.

A-4941-18

In 2015, Elizabeth Pinto, Byrd's ex-girlfriend, implicated defendants in Jonelle's murder and gave law enforcement their biggest break in the case. Pinto testified that she had met Byrd in 2009 and had dated him for approximately six months, from around April to October 2009. Pinto said Byrd, Spraulding, and Jean-Baptiste were friends and all three hung out together "[m]aybe a few times a week." Pinto testified that police first approached her in January of 2011, at which time she provided phone numbers for all three defendants, but nothing else. Investigators met with Pinto again in 2014, and in 2015. During a December 8, 2015, recorded interview, portions of which were played for the jury, MCPO Detective Scott Samis read Pinto her Miranda[2] rights and told her that arrests had been made, without specifying who had been arrested. Pinto then confessed to her involvement in Jonelle's murder and implicated defendants for the first time. Pinto provided police with more details on December 17, 2015, in another recorded interview that was also played for the jury.

Pinto's trial testimony was generally consistent with her prior incriminating statements. She recounted that one night "around September 2009," she drove all three defendants to "an apartment complex" "across . . . [from] a liquor store" to "steal some money . . . that they heard was in an

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

apartment." Pinto testified that all four of them had begun the night at Byrd's mother's house on Sewall Avenue where Byrd lived. Pinto said defendants were talking about taking "a large sum of money" from what they described as a "trap house." According to Pinto, all three defendants were dressed in "all black" clothing and all three wore "latex gloves" under "black like leather gloves." Pinto also observed Byrd with a handgun "on his waist."

Pinto testified that all four of them left Byrd's mother's house in a white, "four-door sedan" that Pinto assumed "was a rental." Pinto drove while Byrd sat in the front passenger seat and Spraulding and Jean-Baptiste sat "in the back." One of the men was carrying a backpack. Byrd then directed Pinto where to go. Pinto admitted knowing that defendants were going to commit a crime and described her role as the driver. When they reached a liquor store across the street from an apartment complex, Byrd told her to stop. Pinto recalled that the area was "dark" and had a lot of trees. The liquor store was closed and there was no one outside. Pinto stated it was "[v]ery late . . . . [l]ike into the next day."

Pinto testified that all three defendants "got out [of] the car and went . . . into the apartment complex." Byrd took Pinto's phone with him. Pinto's phone had a "walkie-talkie" feature, called "direct connect." Pinto estimated that

defendants were gone for more than twenty minutes but less than ninety minutes. During that time, Pinto waited in the car. Defendants then came "[r]unning" back to the car "in a panic" and "got in the car in a real hurry" with the backpack. Pinto testified that Byrd "scooted [Pinto] over" and got into the driver's seat, while Spraulding and Jean-Baptiste got in the back. Then, they "just took off" straight ahead, "speeding, like crazy." Spraulding and Jean-Baptiste told Byrd "that he needed to chill out" because speeding would "draw attention." No one said anything about what had occurred. When they arrived at Byrd's mother's house, Pinto got into her own car and went home. Pinto testified that, the next day, Byrd "looked depressed" and "shut down," and was not his usual "talkative" self. She also noticed "a little scratch on his face" but conceded on cross-examination that the first time she had ever mentioned the scratch was in a 2018 interview with police.

In the days following the murder, Pinto said she heard Byrd and Spraulding talking "about something that maybe would bring problems and that was hidden," but that was "all [she] heard." Sometime later that fall, Jean-Baptiste called Pinto and told her "he wanted to meet up." Thereafter, Jean-Baptiste came to Pinto's house, which he had never done before. While inside the backseat of a car that was being driven by someone Pinto did not identify,

Jean-Baptiste told Pinto he was "trying to figure out who was . . . snitching or something" and told her that "[she] needed to be quiet about anything." Pinto testified that she took his statement "as a threat," explaining that while Jean-Baptiste did not make a "[d]irect threat," "[w]hen you tell somebody to be quiet[,] . . . it means, to be quiet or else."

After Pinto had admitted her involvement and inculpated defendants in Jonelle's death, on December 17, 2015, Samis drove Pinto around in his car to retrace her steps on the night of the murder. Pinto first directed Samis to Byrd's mother's house "where they got ready that night." Because Pinto had trouble remembering the area, she asked Samis to drive to a hospital she knew so she could get her bearings. Then, she directed Samis, turn-by-turn, before asking him to stop when they reached "Munchie's Liquor Store in Neptune City." The liquor store was located "directly across from Brighton Arms I, II, and III," which Samis stated was one of the few "wooded areas" in Neptune City back in 2009.

In January 2016, Pinto entered a negotiated guilty plea to second-degree conspiracy to commit armed burglary. Pursuant to the terms of the plea agreement, the State agreed to dismiss several charges against Pinto, including armed burglary, armed robbery, felony murder, possession of a weapon for an

unlawful purpose, and unlawful possession of a weapon.  The State also agreed to recommend a prison sentence not to exceed seven years, subject to NERA.  The agreement further provided that the State would "consider amending [the] charge to a third-degree burglary and w[ould] consider recommending a sentence of noncustodial probation" if Pinto testified "truthfully against" defendants in connection with Jonelle's murder.  At the time of trial, Pinto had not spent a day in jail and did not expect to serve any jail time.

According to Pinto, after she pleaded guilty, Byrd's sister, Brianna Robinson, messaged Pinto from Byrd's Facebook account, told her that Byrd wanted to talk, and suggested a three-way phone call.  Pinto reported the contact to Samis.  She testified that she did not "feel threatened by" Robinson, but that she "was concerned that [Byrd] was trying to contact" her.

Pinto also testified that back in 2012, Byrd's then-girlfriend Narika Scott had messaged her on Facebook, asking her to contact Byrd.  Scott messaged her again on September 18, 2013, asking Pinto to call her because she wanted to visit her.  When they spoke over the phone, Scott told Pinto "to just be quiet" and asked to meet up with her.  Pinto decided to ignore Scott, explaining at trial that she "thought that was weird" and "didn't feel right about it."  Pinto testified that she understood Scott's "be quiet" statement to mean "be quiet" regarding

23

"anything pertaining to" Byrd.  Pinto later explained that although the "Facebook chat" with Scott was "neutral," she "felt threatened . . . when [they] spoke on the phone" and Scott "told [her] don't say nothing.  Be quiet."

Scott had begun dating Byrd around 1999, and continued to do so for approximately twenty-years while knowing that he dated other women.  Scott testified that she heard about Jonelle's death "around a year after it happened" when police questioned her about it.  A "long time later," she asked Byrd "about that teacher shooting."  Byrd "admitted to [her] about being involved in something" and said he had been with Pinto, but otherwise gave her "no details."  Scott met with police again on December 1, 2015, and told them that Byrd had asked her to say "[h]e was with [her] on [her] birthday," which was September 14.

Scott acknowledged that she had contacted Pinto at Byrd's request and wanted to meet with her to discuss Byrd.  Scott also acknowledged maintaining contact with Byrd and had visited Byrd in jail on September 24, 2016.  Four days later, on September 28, 2016, Scott received an email rant from Byrd, stating:

You fucking stupid ass pissy ass fiend, you acting like I did some other shit. Fuck you stra8 like that. You done some foul shit N want 2 act like gotta be . . . it's fucking paper work on your fucking ass that I was going 2 sweep uder the rug, but fuck you . . . I see what it is, that money not going to last . . . Dropp dead fucker my lawyer going 2 rep your fucking ass on that stand N the whole hood going 2 watch . . . Thinking I'm going 2 cop out . . . You fucking joking, N your dad, he dying real slow anyway, his life almost over, trying 2 get you 2 go against me . . . I was the only nigga that ever gave a flying fuck about you . . . when you was in KINTOC I was the one who gave a fuck.[3]

Scott testified that after receiving the email, "[she] was hurt." She said the statement about the "the whole hood" watching her on the stand made her "uncomfortable." She subsequently received an apologetic email from Byrd. Nonetheless, on the stand, she stated she was scared about testifying in the case.

Marisol Palermo, who met Spraulding around December of 2009, several months after the murder, testified that around February of 2010, Spraulding told her "he had rented a car and his friends took it . . . to Asbury Park" and "some teacher got murdered, but he had nothing to do with it." Spraulding asked Palermo "to say that [she] was with him" at the time of the murder if anyone ever asked her about it.

---

3 Scott had a lengthy prior criminal record with primarily drug related convictions and had served time in prison.

Cano testified that he attempted to obtain cell phone records for all three defendants, but only received records for Byrd's phone number. MCPO Detective Pamela Smith examined the records for contacts that occurred around the time of Jonelle's murder. She testified that there was a traditional phone call between Byrd and Pinto around 7:40 p.m. on September 13, 2009, and another call between them at 6:14 a.m. on the morning of September 14, 2009. As for direct connect calls between Byrd and Pinto's phones, beginning around 1:36 a.m. and continuing to approximately 3:04 a.m. on September 14, 2009, there were multiple calls. The first direct connect communication occurred at 1:36 a.m., the next at 2:38 a.m., followed by communications at 2:40 a.m., 2:41 a.m., 2:47 a.m., 2:48 a.m., 3:01 a.m., and 3:04 a.m.

Adam Durando, who was qualified as an expert in the field of "radio frequency engineering," testified that in the early morning hours of September 14, 2009, cell tower records showed that Byrd's cell phone utilized cell site towers that encompassed the region where the Brighton Arms apartment complex was located. Durando testified that around the time of Jonelle's murder, Byrd's phone "was using towers more towards the north of the area," then "used some towers that were more southerly and then went back up and used towers that were more north of the area." Durando explained that a cell phone could

ordinarily use a tower up to two-and-a-half miles away, but that a phone would use the tower that provided the strongest signal, which was "usually" the tower closest to the phone. Michael Newton, an investigator for the Office of the Public Defender and the only defense witness, testified that Byrd's mother's house on Sewall Avenue was located two-and-a-half miles from Jonelle's apartment.

Initially, law enforcement efforts to retrieve DNA evidence from the crime scene were unsuccessful as the New Jersey State Police lab had "no [DNA] hits." DNA testing on the inside of a latex glove found under Jonelle's body identified only Jonelle's DNA, and the piece of duct tape found in the hallway identified only Jonelle's DNA. Additionally, the only DNA found under Jonelle's fingernails was her own. A swab from the lighter found at the crime scene was also tested with inconclusive results. Ultimately, the decision was made to send some of the physical evidence from Jonelle's apartment to the New York City Office of Chief Medical Examiner (New York lab) because they were "doing a different type of testing . . . called low copy/high template DNA" testing.

Diana Ho, a criminalist at the New York lab who was qualified as an expert in forensic and DNA analysis, testified that the New York lab was using

"high sensitivity testing." She explained that the testing "involve[d] the same four steps" as standard DNA analysis, except that at "every step," "it is enhanced . . . . so that we can detect the small amounts of DNA." Ho testified that there was sufficient DNA on the lighter found in Jonelle's apartment to perform a standard DNA analysis, although Ho also tested the New Jersey lab's swab of the lighter using the high-sensitivity method. Standard DNA testing of the lighter identified "a mixture of DNA from at least three people," one of whom was a "major contributor." After receiving a DNA reference profile for Jean-Baptiste from the New Jersey lab, Ho identified Jean-Baptiste as the major contributor of DNA on the lighter. In a 2012 statement to police that was played for the jury at trial, Jean-Baptiste stated that he smoked "[a] lot of cigarettes" but denied using lighters of the kind found in Jonelle's apartment, which he described as cheap, "crackhead lighters."[4]

In testing other samples provided by the State, Ho identified Michael as a minor contributor of DNA on the piece of duct tape found in Jonelle's hallway.[5]

---

[4] In the same statement, Jean-Baptiste stated he had "hung out" with Fair in the past, but claimed they were not close.

[5] Cano testified that "even though [Michael's] DNA was found in the apartment," it was not unusual "because he would frequent Jonelle's apartment" and he had "found [Jonelle's] body."

A-4941-18

Ho also tested the latex glove found near Jonelle's patio, and, while she could not exclude Byrd as a contributor, she determined that it was "1,630 times more probable" that the DNA came from three unknown persons as opposed to coming from Byrd and two unknown contributors.  Ho testified that "[f]or all the other samples, [Byrd] was excluded as a contributor."  Fair and Davis were also excluded as contributors from all items tested.

Following deliberations, the jury found all three defendants guilty on counts one through six of Indictment No. 16-04-718, and Byrd and Jean-Baptiste guilty on count seven of Indictment No. 16-04-718 charging witness tampering. The jury also found Byrd guilty of the two additional witness tampering counts in Indictment No. 18-06-809.  The witness tampering count in Indictment No. 16-04-718 pertained to Pinto.  Count one of Indictment No. 18-06-809 pertained to Scott and count two pertained to Pinto.  Following a second bifurcated sequential trial before the same jury, Byrd and Spraulding were also convicted of the certain person counts contained in counts eight and nine of Indictment No. 16-04-718, respectively.  Subsequently, all three defendants were sentenced. Conforming judgments of conviction (JOCs) were entered on May 24, 2019, for

Spraulding, June 6, 2019, for Byrd, and June 26, 2019, for Jean-Baptiste.[6] These

appeals followed.

## II.

All three defendants challenge the trial judge's evidentiary rulings barring

out-of-court statements allegedly incriminating others in the murder and

contradicting Pinto's testimony.  Specifically, in Point I, Byrd argues that the

judge abused his discretion and committed reversible error by excluding out-of-

court statements made by Fair taking responsibility for the murder and "acting

with others who were not the defendant or the codefendants."  According to

Byrd, "th[e] statements were admissible hearsay as statements against interest"

under N.J.R.E. 803(c)(25),[7] and "exclusion of that third-party-guilt evidence

violated [his] Sixth Amendment right to present a defense, his Fourteenth

Amendment rights to due process and a fair trial, and his corresponding state-

constitutional rights."  Jean-Baptiste and Spraulding make the same argument in

Points I and II of their briefs, respectively.  Additionally, Jean-Baptiste argues

---

[6]  Amended JOCs were entered for Jean-Baptiste and Byrd.

[7]  Effective July 1, 2024, the exception to hearsay for statements against interest
will be relocated from N.J.R.E. 803(c)(25) to N.J.R.E. 804(b)(3).  Sup. Ct. of
N.J., Notice to the Bar: Rules of Evidence – Adoption of Amendments to
N.J.R.E. 803(c)(25) and N.J.R.E. 804(b)(3) (Sept. 15, 2023).

the judge erred by excluding an out-of-court inculpatory statement made by Fair's associate, Kevin Brown, and by denying "defense counsel's application to question the lead investigator about Brown's statement."

Byrd moved to admit Fair's out-of-court statements to four witnesses who then described Fair's statements to police. In the statements, Fair took responsibility for Jonelle's murder and implicated persons other than defendants in the crimes. The witnesses were Ciara Williams, Jenay Henderson, Kevin Clancy, and Kyre Wallace.[8]

As to Williams, Fair bragged to her about getting away with Jonelle's murder. Fair told Williams that he overheard Alicia Stewart "beefing with her boyfriend Munch" about him "keep[ing] all his money . . . wrapped up in foil in the freezer" so he and Kevin Brown "followed Munch home one night and that's how they found out where Munch lived." Fair said when he and Brown returned "[t]he next night" to rob "Munch," they went to the wrong apartment but "we wasn't leaving no witnesses." Fair also told Williams that he and Brown had

---

[8] Byrd's attorney did not name the potential witnesses he planned to call at trial. However, the witnesses and their statements to police were identified in the State's reply brief to the motion. Although "[b]riefs submitted to the trial court" are ordinarily prohibited from inclusion in the record on appeal, R. 2:6-1(a)(2), the briefs contain necessary facts that cannot be found in full elsewhere in the record and are therefore properly included as "essential to the proper consideration of the issues." R. 2:6-1(a)(1).

used Jean-Baptiste's car that night and when Jean-Baptiste learned what they had done, he was angry.

Regarding Henderson, Fair told her that "it was set up as a robbery but when they went to go rob the apartment it was the wrong apartment" and because "the lady seen us[,] . . . we had to do what we had to do." Fair did not tell Henderson who was with him. As to Clancy, Fair admitted to him that he had been involved in the murder of "a teacher from Red Bank." Fair told Clancy "he had kicked the door in to rob a drug dealer for two hundred bricks" but "they kicked in the wrong door and the woman that was in the apartment that they entered saw all their faces" so they killed her "[e]xecution style." Fair told Clancy his "baby mother" was "the driver and . . . heard the shot." Fair also identified his co-conspirators to Clancy by the street names "'G' and 'Heim' or something with an H."

Finally, Fair told Wallace that he committed a burglary with three men. Fair said they intended to burglarize David James's apartment to steal money from his freezer but they broke into the wrong apartment, encountered a lady, and "fucked her up" when she started screaming and fighting with them. Fair told Wallace that Darius Long "was the look[-]out and the driver," while Bonnie Ivory and Kevin Brown "came inside to help search the apartment and 'keep the

lady under control.'"  Although Fair acknowledged having a gun, he specifically denied shooting Jonelle in his statement to Wallace.

In denying Byrd's motion, the judge acknowledged that the defense sought "to elicit . . . Fair's out of court statements through" the testimony of Henderson, Williams, Clancy, and Wallace, rather than through the detectives they had spoken to about Fair's statements.  The judge determined the statements were inadmissible as statements-against-interest, N.J.R.E. 803(c)(25), or any other hearsay exception, reasoning:

> Counsel . . . has failed to demonstrate that Mr. Fair is unavailable to testify.  Counsel . . . has made no proffer that reasonable means were used to procure Mr. Fair's attendance at trial.  Mr. Fair has not appeared in court and refused to testify.  Counsel . . . may avoid the hearsay issue entirely by calling Mr. Fair as a defense witness, where Mr. Fair will be subject to cross-examination by the State.
>
> . . . .
>
> Mr. Fair's unsworn statements to Ms. Henderson, Ms. Williams, Mr. Clancy, and Ms. Wallace about his involvement in [Jonelle's] death are inherently unreliable.  On February 12, 2014, while in custody, Mr. Fair admitted that he lied to Ms. Williams when he told her that he killed [Jonelle].  On August 21, 2015, Mr. Fair told detectives that he may have "taken credit for the murder . . . to make himself look cool." Additionally, during Mr. Fair's sworn plea colloquy, he clearly states that he conspired to commit a burglary with a gun, but ultimately did not commit the burglary.

33

Turning to Brown, during direct examination, Samis testified that he met with Brown, "an associate of" Fair, and was "able to rule [Brown] out" as a suspect because there was "[n]o DNA evidence, no corroborating witness statements, nothing linking him to this crime at all, no phone tower hits. Nothing." Samis specified he did not "look at any evidence that Kevin Brown was involved in this crime." Counsel for Jean-Baptiste objected, arguing that Samis had "told a falsehood" and "opened the door" to evidence linking Brown to Jonelle's murder. Counsel said that a statement by Brown that "he could have been in the car with James Fair but did not go inside the apartments and needed some time to think if he was there" was in Samis's report. Counsel argued that he was offering the statement "not . . . for the truth of the matter asserted," but "to impeach Detective Samis." The judge ruled that Brown's statement did not actually contradict Samis's testimony, which "gave specific reasons why [Brown] was ruled out." The judge concluded that the statement was "hearsay" and the defense could not impeach Samis with Brown's hearsay statement.

The trial court's determinations on the admissibility of evidence are reviewed for abuse of discretion. State v. R.Y., 242 N.J. 48, 64 (2020). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an

impermissible basis.'" Id. at 65 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). Additionally, "[a] trial court's 'discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury.'" Ibid. (quoting State v. Cope, 224 N.J. 530, 554-55 (2016)).

Where a defendant seeks to admit evidence of third-party guilt, the court must determine, first, whether the evidence has "'a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'" Id. at 66 (quoting State v. Fortin, 178 N.J. 540, 591 (2004)). This "liberal" standard, State v. Koedatich, 112 N.J. 225, 302 (1988), is intended to prevent conjectural or "'unsupported claims [from] infect[ing] the process,'" R.Y., 242 N.J. at 66 (quoting State v. Loftin, 146 N.J. 295, 345 (1996)).

The standard only requires that the evidence is "'capable of demonstrating "some link between the [third-party] evidence and the victim or the crime,"'" or that the evidence creates the "'possibility of reasonable doubt.'" Id. at 66-67 (alteration in original) (quoting State v. Perry, 225 N.J. 222, 238-39 (2016)). "Put another way, '[s]omewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case.'" Id. at 67 (alteration in original) (quoting State v. Sturdivant, 31 N.J. 165, 179 (1959)).

For example, our Supreme Court has held that a "person who confesses to the crime of which the defendant is accused should not be barred from the witness stand" unless "the confessor's claim is so patently false because it was impossible for him to have committed the crime," such as if the confessor was unquestionably incarcerated when the crime occurred. Cope, 224 N.J. at 555. If the defendant's third-party guilt evidence creates the possibility of reasonable doubt, the court must then "determine whether it would be admissible under the New Jersey Rules of Evidence." R.Y., 242 N.J. at 69.

"Hearsay," an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement," N.J.R.E. 801(c)(2), is inadmissible unless it falls within an exception provided by the rules of evidence or other law. N.J.R.E. 802. While hearsay evidence is generally "considered untrustworthy and unreliable," exceptions exist where "the circumstances under which the statements were made provide strong indicia of reliability." State v. Nevius, 426 N.J. Super. 379, 393 (App. Div. 2012) (quoting State v. Phelps, 96 N.J. 500, 508 (1984)).

N.J.R.E. 803(c)(25) exempts from the rule against hearsay a "statement against interest," defined as follows:

> A statement which was at the time of its making so far
> contrary to the declarant's pecuniary, proprietary, or

social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true.

"[T]he test of admissibility under N.J.R.E. 803(c)(25) is 'whether, in the context of the whole statement, the particular remark was plausibly against the declarant's penal interest, even though it might be neutral or even self-serving if considered alone[.]'" Rowe v. Bell & Gossett Co., 239 N.J. 531, 559 (2019) (quoting Nevius, 426 N.J. Super. at 394). "[S]tatements that so disserve the declarant are deemed inherently trustworthy and reliable" based on "the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably." Id. at 558 (quoting State v. Brown, 170 N.J. 138, 148-49 (2001)). However, other portions of a declarant's statement that are exculpatory of a defendant will be inadmissible if those portions "do not expose the declarant to criminal liability." Nevius, 426 N.J. Super. at 395. "Nevertheless, the entire statement may be admissible 'if the exculpatory portions strengthen the incriminating effect of the inculpatory portions.'" Ibid. (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 803(c)(25) (2011)).

A-4941-18

"Admission of a statement under N.J.R.E. 803(c)(25) is not contingent on a showing of 'extrinsic circumstances bearing on the general reliability or trustworthiness of the declarant's statement[.]'" Rowe, 239 N.J. at 558 (quoting State v. White, 158 N.J. 230, 240 (1999)).  Admissibility "must be determined on 'a statement's self-incriminating character' alone."  State v. Williams, 169 N.J. 349, 359 (2001) (quoting White, 158 N.J. at 240).  Extrinsic circumstances of reliability, "such as the fact that the [declarant] . . . could have been engaging in a 'show of bravado'" by making a statement against interest, "pertain solely to the weight given to the statement" by the jury.  Id. at 361.

Here, we conclude that Fair's out-of-court statements satisfy the standard for the admission of third-party guilt evidence and the judge's decision to exclude them constituted a mistaken exercise of discretion.  As confessions to burglary and murder, Fair's alleged statements exposed him to criminal liability and thereby qualified as statements against interest within the meaning of N.J.R.E. 803(c)(25).  Contrary to the judge's ruling, a statement against interest is admissible "'even though the declarant does not testify at trial'" and was not shown to be unavailable by the party offering the declarant's statement.  Rowe, 239 N.J. at 558 (quoting Hill v. N.J. Dep't of Corr. Comm'r Fauver, 342 N.J. Super. 273, 301 (App. Div. 2001)).

A-4941-18

The judge's second basis for excluding Fair's out-of-court statements, that they were "inherently unreliable" because Fair recanted and explained he was trying "to make himself look cool," was equally improper. As statements against his penal interest, Fair's confessions are "'deemed inherently trustworthy and reliable.'" Rowe, 239 N.J. at 558 (quoting Brown, 170 N.J. at 149). The statements' "'self-incriminating character'" is the sole deciding factor to their admissibility under N.J.R.E. 803(c)(25). Williams, 169 N.J. at 359 (quoting White, 158 N.J. at 240). By contrast, Fair's subsequent statements to police and in his plea colloquy were "extrinsic circumstances" of reliability that "pertain[ed] solely to the weight" of his confessions once admitted. Id. at 361.

Next, we turn to the judge's decision denying counsel for Jean-Baptiste the opportunity to impeach Samis's credibility using Brown's statement from his report. Counsel sought to introduce the statement to impeach Samis's credibility, not as substantive evidence or for "the truth of the matter asserted in the statement." N.J.R.E. 801(c)(2). "A prior inconsistent statement may . . . be used to attack the credibility of a witness." Parker v. Poole, 440 N.J. Super. 7, 22 (App. Div. 2015) (citing N.J.R.E. 607). A prior inconsistent statement is one that "contradict[s] or call[s] into question the [declarant's] version of events as recounted at trial." State v. Burris, 145 N.J. 509, 535 (1996). Extrinsic evidence

of a prior inconsistent statement may be excluded if the "party seeking to impeach a witness with a prior inconsistent statement [does not] afford that witness 'an opportunity to explain or deny the statement.'" State v. Williams, 184 N.J. 432, 452 (2005) (quoting N.J.R.E. 613(b)).

The judge denied the defense an opportunity to impeach Samis with his report, explaining that it was not inconsistent with Samis's testimony because Samis gave "specific reasons why" Brown was ruled out as a suspect. Irrespective of the fact that Samis gave "specific reasons why" Brown was ruled out as a suspect, Samis testified that he did not "look at any evidence that Kevin Brown was involved in this crime" and that there was "nothing linking [Brown] to th[e] crime at all." This testimony went beyond explaining why Brown was ruled out as a suspect and gave the impression that there was absolutely no reason to suspect Brown. At a minimum, Samis's prior statement that Brown admitted he "could have been in the car" called this testimony "into question." Burris, 145 N.J. at 535. Therefore, we are persuaded that the judge's ruling denying the defense an opportunity to impeach Samis with his report was a mistaken exercise of discretion.

Notwithstanding the erroneous evidentiary rulings, our inquiry does not end there. We must next determine whether the error was harmless. To

determine whether an erroneous evidentiary ruling constitutes harmless error, the relevant inquiry is whether the purported error "'is of such a nature as to have been clearly capable of producing an unjust result.'" R.Y., 242 N.J. at 71 (quoting R. 2:10-2). "[T]he harmless-error standard . . . requires that there be 'some degree of possibility that [the error] led to an unjust result.'" State v. Ingram, 196 N.J. 23, 49 (2008) (second alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

"'The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" R.B., 183 N.J. at 330 (alteration in original) (quoting State v. Bankston, 63 N.J. 263, 273 (1973)). To that end, "we consider the importance of [excluded] testimony in the broader context of defendant's trial." State v. Bass, 224 N.J. 285, 308 (2016). As such, any error will be found "harmless" where "the evidence against [the] defendant [is] . . . overwhelming." State v. Trinidad, 241 N.J. 425, 433 (2020); see, e.g., State v. Hightower, 120 N.J. 378, 410 (1990) (holding officer's testimony that defendant "was the person responsible for the murder" was harmless error because of "the strength of the State's case, the length of the trial, and the number of witnesses called").

A-4941-18

Here, given the substantial evidence of guilt and the importance of the excluded testimony in the context of the trial, we are satisfied the erroneous evidentiary rulings were harmless. Although defendants' third-party guilt evidence was more than "mere conjecture," Sturdivant, 31 N.J. at 179, it did not have a clear capacity to change the verdict because the evidence was weak. Fair's alleged statements were inconsistent with each other and implicated different accomplices. For example, in one statement, he said he shot Jonelle, but in another, he said no one shot her. Also, in one statement, he said his child's mother was the driver while in another, he said a man named Darius Long was the driver. Additionally, Fair's statement to Clancy that "they kicked in the" door to Jonelle's apartment was inconsistent with the physical evidence showing no forced entry. As for Brown's statement in Samis's report, an attack on Samis's credibility using the report was unlikely to damage Samis's credibility in any meaningful way because it did not directly undercut Samis's testimony that Brown was ruled out for a variety of well-founded reasons. Moreover, Samis's testimony about Brown was not critical to the State's case.

On the other hand, the State presented powerful evidence of defendants' guilt. Pinto's account implicating defendants was corroborated by Jean-Baptiste's DNA found on a lighter beneath the point of entry in Jonelle's

42

apartment, cell tower data showing Byrd's phone connecting with towers closer to Jonelle's apartment around the time of the murder, phone records showing several direct-connect calls with Pinto's phone which was in Byrd's possession at the relevant times, and a neighbor's observation of a man standing behind the building wearing all black clothing at the time in question. Pinto's account was further corroborated by James's testimony that he kept sixteen- to twenty-thousand dollars in his freezer, and evidence that Fair, whom Jean-Baptiste admitted knowing, had overheard James's girlfriend talking about the money and had inquired about James's address. The State also produced powerful consciousness of guilt evidence for all three defendants through the testimony of Pinto, Scott, and Palermo.

## III.

In Point II of his brief, Byrd argues that the judge abused his discretion in admitting improper expert opinion testimony from Kavanaugh, and improper lay opinion testimony from Cano, Samis, and MCPO Lieutenant Donna Morgan. Byrd asserts that "[b]ecause the expert and non-expert opinion testimony was offering an opinion on the ultimate issue in the case on a matter not beyond the ken of the average juror, it was improper under N.J.R.E. 701 and N.J.R.E. 702." Jean-Baptiste and Spraulding present substantially similar arguments in Points

43

II and III of their briefs, respectively. They contend that Kavanaugh's opinions about the number of perpetrators and manner of entry into Jonelle's apartment had no factual support and impinged on matters the jury was equally capable of evaluating. Further, they argue the lay opinion testimony of Cano and Samis that they ruled out three people as suspects, and testimony by Morgan explaining the State's theory of the case at length invaded the fact-finding province of the jury, improperly bolstered the State's theory of the case, and "decimated" the defense theory of third-party guilt.

Because defendants raise these issues for the first time on appeal, we review for plain error. State v. Clark, 251 N.J. 266, 286-87 (2022).

> Under that standard, an unchallenged error constitutes plain error if it was "clearly capable of producing an unjust result." The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."
>
> [Id. at 287 (citations omitted) (first quoting R. 2:10-2; and then quoting State v. Melvin, 65 N.J. 1, 18-19 (1974)).]

"Plain error is a high bar and constitutes 'error not properly preserved for appeal but of a magnitude dictating appellate consideration.'" State v. Santamaria, 236 N.J. 390, 404 (2019) (quoting State v. Bueso, 225 N.J. 193, 202 (2016)). "To determine whether an alleged error rises to the level of plain error,

44

it 'must be evaluated "in light of the overall strength of the State's case."'" Clark, 251 N.J. at 287 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). Indeed, "a guilty verdict following a fair trial and 'based on strong evidence proving guilt beyond a reasonable doubt[ ] should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result.'" State v. Cotto, 471 N.J. Super. 489, 537 (App. Div. 2022) (alteration in original) (quoting State v. J.R., 227 N.J. 393, 417 (2017)).

The admissibility of expert testimony is governed by N.J.R.E. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The Rule imposes three requirements for the qualification of an expert and the admission of his or her testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Jenewicz, 193 N.J. 440, 454 (2008).]

"Under the Rule, expert testimony is not appropriate to explain what a jury can understand by itself." State v. J.L.G., 234 N.J. 265, 305 (2018). "Matters 'within the competence of the jury' are for the collective wisdom of the jury to assess," while "issues that are beyond the understanding of the average juror may call for expert evidence." Ibid. (quoting State v. Sowell, 213 N.J. 89, 99 (2013)). All three of N.J.R.E. 702's "requirements are construed liberally in light of [the Rule's] tilt in favor of the admissibility of expert testimony." Jenewicz, 193 N.J. at 454 (citing State v. Berry, 140 N.J. 280, 290-93 (1995)).

Nonetheless, even if qualified under N.J.R.E. 702, an expert is not permitted to tender an opinion that is "not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006). N.J.R.E. 703 requires that expert opinion be grounded in

> "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject."
>
> [Ibid. (quoting Richard Biunno, New Jersey Rules of Evidence 896 (2005)).]

The "net opinion" rule, a corollary of N.J.R.E. 703, "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion."

Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). While a conclusion "based merely on unfounded speculation and unquantified possibilities" must be excluded, failure "'to account for some particular condition or fact which the adversary considers relevant'" or "'give weight to a factor thought important by an adverse party'" may be "a proper 'subject of exploration and cross-examination at a trial'" but is not a basis for exclusion. Townsend v. Pierre, 221 N.J. 36, 54-55 (2015) (first quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997); then quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005); and then quoting Rosenberg, 352 N.J. Super. at 402).

Under N.J.R.E. 701, lay witnesses may give relevant opinion testimony if that opinion "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." State v. McLean, 205 N.J. 438, 456 (2011) (quoting N.J.R.E. 701). To satisfy the first condition, the "witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)). The second condition limits lay testimony only to that which will "assist the trier of fact either by helping to explain the witness's testimony or by shedding light

on the determination of a disputed factual issue." Id. at 469 (quoting State v. Singh, 245 N.J. 1, 15 (2021)).

The first element "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." McLean, 205 N.J. at 457. Thus, knowledge based "on the hearsay statements of others" does not satisfy the first element. Sanchez, 247 N.J. at 469. The second element precludes "lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'" Id. at 469-70 (alteration in original) (quoting McLean, 205 N.J. at 459).

Neither lay nor expert opinion testimony is "a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." McLean, 205 N.J. at 462. In State v. Frisby, 174 N.J. 583, 588 (2002), police investigated parents for the death of their infant son. The mother and father gave conflicting accounts of who was responsible for the child's care the night he died. Id. at 588-89. Police charged the mother and testified at her trial regarding their decision to arrest her and not the father. Id. at 590. In particular, the officers explained that they thought the father was more credible, and relayed hearsay from non-testifying witnesses that verified the father's alibi. Id. at 591-92. The officers went so far

as to tell the jury directly that the hearsay statements "substantiated" the father's testimony.  Id. at 595.

The Court held that admission of the officers' testimony was error, reasoning that the testimony regarding the father's credibility "'irresistibly' implicated" the mother "by 'necessary inference.'"  Id. at 593-96 (quoting State v. Roach, 146 N.J. 208, 224-25 (1996)).  The Court explained that such testimony is, like a direct commentary on guilt, improper, and that "the mere assessment of another witness's credibility is prohibited."  Id. at 594.  Moreover, because the evidence against the mother was scant, the Court concluded that "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrant[ed] reversal."  Id. at 596.

Here, Kavanaugh was qualified as an expert in "the field of crime scene processing" and "fingerprinting" analysis.  Her qualifications were not challenged at trial or now on appeal.  Nor do defendants dispute that crime scene analysis is "beyond the ken of the average juror."  Jenewicz, 193 N.J. at 454. Kavanaugh opined that there were three intruders, and the initial point of entry was a window that had the screen cut out.  She testified that the rear sliding door and front door were found open, but with no signs of forced entry.  There was dirt on the floor by the sliding glass door, and the front door had blood on it,

suggesting, in Kavanaugh's opinion, that the perpetrators exited through the front door after killing Jonelle.

According to Kavanaugh, immediately under the window was a chair with partial footprints on it. Kavanaugh described the chair as a "café chair" and testified that there was a "café table" in the kitchen, suggesting that an intruder had moved the chair from the table to the window. Kavanaugh's conclusion that there were three intruders, one who crawled through the window and moved the chair to assist a second person who went through the window and stepped on the chair, and a third who was let in through the sliding door, was a logical explanation for there being two apparent points of entry and for the position of the chair.

We therefore reject defendants' arguments that Kavanaugh's opinions were not grounded in facts presented at trial. On the contrary, Kavanaugh's opinions, for which she gave the "'why and wherefore,'" Townsend, 186 N.J. at 494 (quoting Rosenberg, 352 N.J. Super. at 401), were based on facts in evidence, not speculation. Equally unpersuasive are defendants' contentions that Kavanaugh's opinions explained what the jury could understand for itself. Kavanaugh, having specialized knowledge of crime scene analysis, offered an

opinion that could "assist the trier of fact to understand the evidence."  N.J.R.E. 702.

Turning to defendants' challenge to lay opinion testimony provided by Cano, Samis, and Morgan, all law enforcement personnel assigned to work on the case, Cano testified he was able to rule Michael out as a suspect, explaining:

> During the investigation, [Michael] was very cooperative, especially in the beginning of the investigation.  He provided his DNA.  His statement[ and] his phone records were all corroborated.  We also know that . . . he did not leave [his girlfriend's] apartment the night of the homicide, and we also know that he had a good relationship with Jonelle, even though they were in the process of getting divorced, they still had a good relationship, they were still being intimate; and also they had a good working relationship, and even though his DNA was found in the apartment, . . . it's not uncommon because he would frequent Jonelle's apartment.  And also he found Jonelle's body and . . . called us for help, so he was there that day.  So there's no motive for him to do anything like that to Jonelle.

Cano provided similar testimony regarding Davis, stating he was "able to rule [Davis] out as a suspect" because "[t]here was no forensics, no witnesses, there was nothing linking him to the crime scene, and throughout the investigation, he stayed very cooperative."  Likewise, Samis testified he was "able to rule [Brown] out" as a suspect because there was "[n]o DNA evidence,

A-4941-18

no corroborating witness statements, nothing linking him to this crime at all, no phone tower hits. Nothing."

As to Morgan, Jean-Baptiste's attorney asked her on cross-examination if she knew "the theory of this case" and she replied "yes." On re-direct, the prosecutor asked Morgan "[w]hat is the State's theory?" While not specifically mentioning defendants, Morgan proceeded to explain the State's theory at length and in great detail. Her explanation included, among other things, the State's claim that "several gentlemen broke into [Jonelle's] apartment by mistake thinking they were hitting an apartment several doors down," that one person entered through Jonelle's window and "push[ed] the chair over" "[t]o make it easier for the second person" to climb through, and that the perpetrators left the apartment through "[t]he front door." Morgan testified that the State's theory was "consistent" with the physical evidence as well as "the forensic evidence."

We agree with defendants that all three officers gave improper lay opinion testimony that usurped the role of the jurors. Although the officers were explaining their investigation, "[m]uch of the material which is developed during the course of an investigation is inadmissible at a trial. It may consist of hearsay, suspicion, innuendo or opinion. Such material may serve a valuable

investigatory purpose and yet not be admissible at a trial." State v. Kearney, 109 N.J. Super. 502, 506 (Law Div. 1970).

All three officers improperly offered their opinions "on the meaning of facts that the jury [was] fully able to sort out." McLean, 205 N.J. at 461. Lay opinion testimony is not "a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself." Id. at 462. Further, the officers' knowledge was based in part "on the hearsay statements of others," which does not satisfy the first element of N.J.R.E. 701. Sanchez, 247 N.J. at 469.

Although several of the witnesses whose pre-trial statements establishing the foundation for the officers' conclusions testified at trial, the fact that a witness testifies at trial "does not render admissible [his or her] hearsay statements." Neno v. Clinton, 167 N.J. 573, 581 (2001).

> [A] police officer cannot provide an opinion at trial when that opinion is based primarily on the statements of eyewitnesses. Any other conclusion would allow an officer to subvert the prohibition against hearsay and pass along the essence of those hearsay statements to the jury even when the officer is not permitted to testify to the substance of the witness's statements under the hearsay rule. Further, the fact that those statements were the basis for [the officer's] lay opinion will not render them admissible because to do so would defeat the purpose of the hearsay rule. The purpose of N.J.R.E. 701 is to ensure that lay opinion is based on an

adequate foundation. A lay witness's opinion cannot rely on the inadequate support of inadmissible hearsay without the benefit of an exception. Consequently, a police officer cannot advance an opinion when it is primarily based on the hearsay statement of an eyewitness.

[Id. at 585.]

In addition, in endorsing as true statements that were repeated at trial, Cano and Morgan effectively gave an impermissible "assessment of another witness's credibility." Frisby, 174 N.J. at 594.

Although admission of the testimony was erroneous, it did not have a clear capacity to produce an unjust result. See R. 2:10-2. As previously explained, the State's evidence against defendants was substantial. Also, much of the evidence relied upon by Cano and Morgan to form their opinions was properly admitted at trial through other competent sources. Therefore, we conclude the error does not rise to the level of plain error.

IV.

Defendants assert numerous jury instruction errors in their briefs. In Point III of his brief, Byrd argues: (1) the jury instructions for robbery erroneously omitted an explanation of attempted theft; (2) the judge's use of "and/or" language in multiple instructions allowed for a non-unanimous verdict; (3) the judge erred in instructing the jury that it could convict defendants based on

54

Pinto's "testimony alone"; and (4) the judge erroneously omitted an instruction on accomplice liability from his instruction on witness tampering. These issues were not raised at trial. Jean-Baptiste and Spraulding raise some of the same issues as well as additional ones in Points VI and IV of their briefs, respectively. Jean-Baptiste argues that the judge erred in denying defendants' request for a "false-in-one, false-in-all" charge, while Spraulding argues the judge erred by taking "judicial notice" that "possession of [controlled dangerous substances (CDS) was] a predicate offense" in his instruction to the jury in the sequential trial on the certain persons count.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (quoting State v. Green, 86 N.J. 281, 287 (1981)). "Jury charges must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting Green, 86 N.J. at 287-88).

If a defendant does not object when a charge is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting Singleton, 211 N.J. at 182). When there is no objection, we review for plain

error and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2); see State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if he does not object to the instructions as required by Rule 1:7-2.").

Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant [and] sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (first alteration in original) (quoting Adams, 194 N.J. at 207). "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

To determine whether there was error in a jury charge, "[t]he charge must be read as a whole." State v. Torres, 183 N.J. 554, 564 (2005) (citing Jordan, 147 N.J. at 422). We "must not look at portions of the charge alleged to be erroneous in isolation; rather, 'the charge should be examined as a whole to determine its overall effect,' and 'whether the challenged language was

misleading or ambiguous.'" State v. McKinney, 223 N.J. 475, 494 (2015) (internal citations omitted) (first quoting Jordan, 147 N.J. at 422; and then quoting State v. Nelson, 173 N.J. 417, 447 (2002)).

In addition, the error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

> We note also that, "[a]lthough arguments of counsel can by no means serve as a substitute for instruction by the court, the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel."
>
> [Adams, 194 N.J. at 207 (alterations in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)).]

Byrd argues that although "the judge initially correctly noted that a mere attempted theft will suffice as the theft element of a robbery, he never defined as part of either robbery instruction the mens rea or actus reus necessary to constitute a criminal attempted theft under N.J.S.A. 2C:5-1." Jean-Baptiste and Spraulding make the same argument.

> The crime of robbery includes attempted theft. A person commits robbery if "in the course of committing a theft" the person inflicts bodily injury or uses force upon another, threatens another with or purposely puts the other in fear of immediate bodily injury, or commits or threatens immediately to commit a crime of the first

57

> or second degree. N.J.S.A. 2C:15-1(a)(1)-(3). An act is "deemed . . . included . . . 'in the course of committing a theft' if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission." N.J.S.A. 2C:15-1(a)(3).
>
> [State v. Dehart, 430 N.J. Super. 108, 116-17 (App. Div. 2013) (omissions in original).]

A person is guilty of an attempt to commit a crime "if, acting with the kind of culpability otherwise required for commission of the crime," the person "[p]urposely does . . . anything which, under the circumstances as a reasonable person would believe them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." N.J.S.A. 2C:5-1(a)(3). To prove criminal attempt, "[t]he State is tasked with proving both a criminal purpose and a substantial step toward the commission of the crime." State v. Jones, 242 N.J. 156, 169 (2020) (citing State v. Perez, 177 N.J. 540, 553 (2003)).

In Dehart, we held that where a defendant is charged with robbery and "there [is] no evidence of an actual [completed] theft, the court [is] required to instruct the jury on the law of attempt as an element of robbery." 430 N.J. Super. at 119. We concluded a trial court's failure "to instruct the jury on the elements of attempt" where there was "no competent evidence [the] defendant took anything from" the victim was plain error. Id. at 120. Likewise, in State v.

Gonzalez, we found the omission of an attempt charge as an element of robbery, or any definition of attempt anywhere in the charge, to be plain error where "the State was unable to offer any evidence that the victim . . . was actually robbed." 318 N.J. Super. 527, 532-33 (App. Div. 1999).

Conversely, in State v. Smith, 322 N.J. Super. 385, 399 (App. Div. 1999), we concluded that a trial court's failure to define attempt in a jury charge on robbery was not plain error where the court "instructed the jury on the elements of attempt" elsewhere in the jury instructions. We reasoned that "the appearance elsewhere in the jury instructions of a proper charge on attempt," "coupled with the overwhelming evidence of [the] defendant's guilt," including the defendant's own testimony he helped plan and carry out the robbery, left "no doubt that the failure to define attempt in the robbery charge did not prejudice [the] defendant's rights." Id. at 400. We distinguished Gonzalez on the ground that "there was no definition of attempt anywhere in the charge." Smith, 322 N.J. Super. at 399 (citing Gonzalez, 318 N.J. Super. at 536).

Here, the judge's instruction on robbery included an explanation that the State was required to prove defendant "was in the course of committing a theft." Although the judge instructed the jurors that "an act is considered to be in the course of committing a theft if it occurs in an attempt to commit the theft," at

that juncture, the judge did not define criminal attempt. However, earlier in the instructions, the judge defined "attempt" in the context of accomplice liability as follows:

> Attempt to aid means that a person takes substantial steps in the course of conduct designed to or planned to lend support or assistance in the efforts of another to cause the commission of a substantive offense.
>
> If you find that the defendant Jean-Baptiste, with the purpose of promoting or facilitating the commission of the offenses, solicited defendants Byrd and/or Spraulding to commit the crimes and/or aided or agreed or attempted to aid Byrd and/or Spraulding in planning or committing them, then you should consider him as if he committed the crimes himself.

Thus, as in Smith, 322 N.J. Super. at 399-400, a proper instruction on attempt appeared elsewhere in the jury charge. Indeed, "during an explanation of the law relating to another offense, . . . the judge fully and accurately instructed the jury on the elements of attempt." Id. at 399. Given the substantial evidence of defendants' guilt "and the appearance elsewhere in the jury instructions of a proper charge on attempt, we have no doubt that the failure to define attempt in the robbery charge did not prejudice defendant[s'] rights." Id. at 400.

Next, Byrd argues the judge's use of "and/or" language in his instructions on felony murder, accomplice liability, and possession of a weapon for an

unlawful purpose each allowed for a non-unanimous verdict. Jean-Baptiste makes identical arguments, and Spraulding joins the challenge to the accomplice liability charge.

"Our Constitution presupposes a requirement of a unanimous jury verdict in criminal cases." State v. Parker, 124 N.J. 628, 633 (1991) (citing N.J. Const. art. I, ¶ 9). Rule 1:8-9 likewise requires unanimity "in all criminal actions." "[U]nanimity requires 'jurors to be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." Frisby, 174 N.J. at 596 (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977)). However, "jurors need not always be unanimous on the theory of guilt, provided they are unanimous in the finding of guilt of the offense charged." State v. Harris, 141 N.J. 525, 562 (1995). Thus, courts have held "that a jury does not have to agree unanimously on whether a defendant has acted as a principal or an accomplice" or as to which of several ways a defendant committed "a single offense that may be committed in a number of cognate ways." Frisby, 174 N.J. at 596-97.

Byrd first argues the judge erred by instructing the jury that defendants could be found guilty of felony murder if Jonelle's death occurred during a "burglary and/or robbery." Byrd contends that this language impermissibly

61

allowed the jury to reach a guilty verdict on felony murder without agreeing on the predicate felony.

Our Supreme Court rejected a similar argument in Harris, where the defendant was convicted of felony murder as well as "burglary, robbery, kidnapping, and sexual assaults," all of which were predicate offenses for the felony murder charge. 141 N.J. at 561. The Court found no plain error in the trial court instructing the jury that the State was required to prove "that the victim's death was caused during the commission or flight after committing one of these enumerated crimes." Id. at 561-62. The Court explained that "when there is sufficient evidence to support two or more alternative felony theories, a jury need not designate which felony theory it relies on to convict one of felony murder so long as there is sufficient evidence to sustain each felony." Id. at 562. The Court posited that if "the jury had acquitted the defendant of one of the predicate felonies, there could be concern about the lack of a specific unanimity instruction." Id. at 563. However, any "concerns [the Court] might have about the possibility of a patchwork verdict . . . vanish" when the jury unanimously finds the defendant guilty of every predicate felony charged. Ibid.

Likewise, here, the jury could not have reached a patchwork verdict because it unanimously found defendants guilty of both predicate felony

charges—robbery and burglary.  Byrd's argument that the judge erred in instructing the jury on possession of a weapon for an unlawful purpose by explaining that the unlawful purpose was to facilitate the commission of a burglary or robbery fails for the same reason.  Thus, the judge did not commit plain error by using "and/or" language in the felony murder and possession of a weapon for an unlawful purpose instruction.

Byrd further argues that the judge's accomplice liability charge allowed for non-unanimous guilty verdicts because it was "riddled with 'and/or' language" and because the judge told the jury "to refer back" to his first accomplice liability instruction, in relation to burglary, when he instructed the jury on robbery and the weapons charges.

"When a defendant might be convicted as an accomplice, the trial court must give clear, understandable jury instructions regarding accomplice liability."  State v. Walton, 368 N.J. Super. 298, 306 (App. Div. 2004).  That occurred here.  First, the judge clearly instructed the jury that "[a]ccomplice status should be considered separately as to each charge," and that "[i]n order to convict the defendant as an accomplice to these specific crimes charged, you must find that the defendant had the purpose to participate in that particular crime."

Next, the judge told the jury:

> In sum, in order to find the defendant guilty of committing the crime of burglary, the State must prove each of the following elements beyond a reasonable doubt:  that defendant Spraulding and/or Jean-Baptiste committed the crimes o[f] burglary and/or armed burglary;  that the defendant solicited defendant Spraulding and/or Jean-Baptiste [to] commit the crimes and/or did aid or agree or attempt to aid defendant Spraulding and/or Jean-Baptiste in planning or committing them; three, that the defendants' purpose was to promote or facilitate the commission of the offenses; and four, that this defendant possessed a criminal state of mind that is required to be proved against the person who actually committed the criminal acts.
>
> Again, you must consider the accompl[ice] charge separately as to each offense charged.

Lastly, when instructing the jury on other counts for which the State had alleged accomplice liability, the judge stated that his earlier accomplice liability charge applied to those counts.  During the charge conference, when the judge stated his "intention" to "read [the accomplice liability charge] from beginning to end after the first count in the indictment and then after that just refer them back to that," Byrd's trial counsel agreed to that approach.  Byrd now contends that the judge's instructions to refer back to the initial accomplice liability charge "allow[ed] the defendant to be convicted of <u>all</u> of those crimes if the jury believed he was an accomplice to only one of them."  We disagree.  The judge

64

was emphatic and clear that accomplice liability should be considered separately as to each offense and any other interpretation defies the judge's clear instructions. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007).

Byrd also argues that, in his initial accomplice liability instruction, the judge "erroneously told the jury that it could convict of second-degree armed burglary if the defendant aided or abetted either third-degree unarmed burglary or an armed one." Relying on State v. Gonzalez, 444 N.J. Super. 62, 70-76 (App. Div. 2016), Byrd contends that this aspect of the court's instruction could have allowed for a non-unanimous guilty verdict.

In Gonzalez, in the conspiracy and accomplice liability jury instructions, the trial judge told the jury to find whether the defendant was liable for "robbery and/or aggravated assault." Id. at 73-74. We found

> the judge's repeated use of the phrase "and/or"—in defining what the jury was obligated to determine—so confusing and misleading as to engender great doubt about whether the jury was unanimous with respect to some part or all aspects of its verdict or whether the jury may have convicted defendant by finding the presence of less than all the elements the prosecution was required to prove.
>
> [Id. at 71.]

We explained:

> In considering the possibility that the verdict was the product of less than unanimous findings by the jury, we observe that the nature of the indictment required that the jury decide whether defendant conspired in or was an accomplice in the commission of a robbery, or an aggravated assault, or both. By joining (or disjoining) those considerations with "and/or" the judge conveyed to the jury that it could find defendant guilty of either substantive offense—which is accurate—but left open the possibility that some jurors could have found defendant conspired in or was an accomplice in the robbery but not the assault, while other jurors could have found he conspired in or was an accomplice in the assault but not the robbery. In short, these instructions did not necessarily require that the jury unanimously conclude that defendant conspired to commit or was an accomplice in the same crime.

[Id. at 75-76.[9]]

Here, the jury had to decide whether Byrd was guilty of second-degree armed burglary or third-degree burglary. In addressing accomplice liability for the "crime of burglary," the judge told the jury that the State had to prove, among other things, "that defendant Spraulding and/or Jean-Baptiste committed the

---

[9] Although the Court denied certification, State v. Gonzalez, 226 N.J. 209 (2016), in its order, the Court agreed that the trial judge's "use of 'and/or' in the jury instruction . . . injected ambiguity into the charge," but added that "[t]he criticism of the use of 'and/or' is limited to the circumstances in which it was used in this case." Ibid.

crimes o[f] burglary and/or armed burglary." Arguably, the "and/or" language risked the possibility of a guilty verdict on second-degree armed burglary even though some jurors only found facts sufficient for third-degree burglary.

However, the sole difference between third-degree burglary and second-degree armed burglary is possession of "a deadly weapon" during commission of the offense. N.J.S.A. 2C:18-2(b). It is undisputed that the jury unanimously determined that all three defendants possessed a deadly weapon during the commission of the crimes, as the jury unanimously found all three defendants guilty of unlawful possession of a weapon and possession of a weapon for an unlawful purpose. Considering these circumstances as well as the judge's clear instruction to consider accomplice status "separately as to each offense," we are satisfied the judge's reference to "burglary and/or armed burglary" did not "'possess[] a clear capacity to bring about an unjust result.'" State v. Afanador, 151 N.J. 41, 54 (1997) (quoting Jordan, 147 N.J. at 422).

Byrd also contends that the judge erred by failing to incorporate accomplice liability into the jury instruction for the two witness tampering counts pertaining to Pinto. Of the two witness tampering counts, one was based on his sister Brianna's communications with Pinto, and the other was based on Scott's. Byrd contends the judge was required to instruct on accomplice liability

67

because Scott and Brianna were the ones who conveyed Byrd's "alleged" messages at his behest.

The witness tampering statute provides in relevant part:

> a. A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted or has been instituted, he knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to:
>
> (1) Testify or inform falsely;
>
> (2) Withhold any testimony, information, document or thing;
>
> (3) Elude legal process summoning him to testify or supply evidence;
>
> (4) Absent himself from any proceeding or investigation to which he has been legally summoned; or
>
> (5) Otherwise obstruct, delay, prevent or impede an official proceeding or investigation.
>
> [N.J.S.A. 2C:28-5(a).]

Under the statute, "the criminal act is completed regardless of whether or not the result is achieved." State v. Speth, 323 N.J. Super. 67, 87 (App. Div. 1999). Witness tampering includes "indirect attempts to tamper with witnesses by making comments either to third parties knowing that they will get back to the witness or even making comments directly to the witness, which, on the one

hand, could be innocent, but in the context of the facts, could be threatening." Id. at 83. "Thus, it is of no consequence that [the] defendant" never "directly approached" the witness. Ibid.

At trial, Byrd argued that he did not engage in witness tampering and thus no crime occurred. As to Scott in particular, Byrd's trial counsel argued that the communications between Scott and Pinto were just "two women . . . [fighting] over" Byrd, a man with whom they had both been involved. "When the State's theory of the case only accuses the defendant of being a principal, and a defendant argues that he was not involved in the crime at all, then the judge is not obligated to instruct on accomplice liability." State v. Maloney, 216 N.J. 91, 106 (2013). Thus, we fail to see how the omission of an accomplice liability charge resulted in plain error or prejudiced Byrd in connection with these two witness tampering counts. "[E]ven if defendant had requested such a charge, the accomplice liability instruction would not have been warranted because it was not grounded in a rational basis in the trial evidence." Id. at 108.

Additionally, Byrd challenges the judge's cooperating witness charge in relation to Pinto. Byrd argues the judge committed reversible error by instructing the jury that "[i]f you believe the witness to be credible and worthy of belief, you have the right to convict the defendants on her testimony alone,

provided, of course, that upon a consideration of the whole case, you are satisfied beyond a reasonable doubt of the defendants' guilt."  Byrd contends the charge was erroneous because Pinto's testimony did not provide sufficient facts to find defendants guilty, noting that Pinto "did not even know when she had given the men the car ride in question, and did not know what the men did."

The judge provided the model jury charge for evaluating cooperating witness testimony.  See Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006).  "A jury charge is presumed to be proper when it tracks the model jury charge verbatim . . . ."  State v. Berry, 471 N.J. Super. 76, 107 (App. Div. 2022), rev'd in part on other grounds 254 N.J. 129 (2023).  The charge communicates the long-standing principle that "a defendant may be convicted solely on the uncorroborated testimony of an accomplice."  Adams, 194 N.J. at 207 (quoting State v. Begyn, 34 N.J. 35, 54 (1961), overruled in part on other grounds by State v. Savoie, 67 N.J. 439 (1975)).  "[T]he uncorroborated testimony of an accomplice, if it satisfies the jury or court beyond a reasonable doubt, is sufficient to sustain a conviction of a felony."  State v. Butler, 32 N.J. 166, 185-86 (1960) (quoting People v. Nitti, 133 N.E.2d 12, 13 (Ill. 1956)).  We find no error, much less plain error, in the judge's instruction to the jury on evaluating Pinto's testimony.

Jean-Baptiste argues the judge erred when he denied his request for a "'false in one[]' charge" because "there was more than sufficient cause" based on Pinto's "material" falsehoods and omissions in her testimony.

The "false in one, false in all" model jury charge instructs the jury that if they believe any witness

> willfully or knowingly testified falsely to any material facts in the case, with intent to deceive [them], [the jury] may give such weight to his or her testimony as [they] may deem it is entitled. [They] may believe some of it, or [they] may, in [their] discretion, disregard all of it.
>
> [Model Jury Charges (Criminal), "False in One - False in All" (rev. Jan. 14, 2013).]

"It has been long recognized that the issuance of a false in one, false in all charge rests in the sound discretion of the trial judge." State v. Young, 448 N.J. Super. 206, 228 (App. Div. 2017); see State v. Ernst, 32 N.J. 567, 583-84 (1960); State v. Fleckenstein, 60 N.J. Super. 399, 408 (App. Div. 1960) (noting that the evidential inference of repetitive falsity is not mandatory). Moreover, "[i]nadvertent misstatements or immaterial falsehoods are not ground[s] for complete rejection of a witness'[s] testimony." State v. D'Ippolito, 22 N.J. 318, 324 (1956). Instead, the charge "should be given to the jury as an aid when a

witness has been discredited out of his own mouth either by cross-examination or by an unimpeached record." State v. Sturchio, 127 N.J.L. 366, 369 (1941).

Here, the judge denied the defense request for the charge, reasoning that although Pinto had made "a number of different statements," and "additional information was added . . . to each one of those statements," the general charge on witness credibility was sufficient to guide the jury on how to evaluate her testimony.  In fact, that charge included an instruction to the jury to consider when evaluating the witness's credibility "whether the witness testified with the intent to deceive [them]" and then determine whether to "accept all of [the testimony], a portion of it, or none of it."  The judge also pointed out that additional jury charges, such as the cooperating witness charge, specifically directed the jury to evaluate Pinto's credibility carefully.  We discern no abuse of discretion in the judge's rejection of the defense request.  Because Jean-Baptiste fails to identify any trial testimony that supported a finding that Pinto was testifying falsely to any material fact, the false in one charge was not appropriate.

Spraulding argues that when the judge instructed the jury in the sequential trial on the certain persons offense, the judge improperly took "'judicial notice' of an element" of the offense.

N.J.S.A. 2C:39-7(b)(1) provides that a person previously convicted of an enumerated offense "who purchases, owns, possesses or controls a firearm is guilty of a crime of the second degree." "Because the offense requires proof of a specific prior conviction, a certain persons charge automatically entails a risk of prejudice to a defendant in a jury trial." State v. Bailey, 231 N.J. 474, 484 (2018). As such, our Supreme Court has "set out the procedural path that certain persons trials must follow to avoid the creation of undue prejudice in establishing the essential element of a predicate conviction." Ibid.

"For efficiency, the same jury may try both charges in succession and may decide the certain persons charge based on the same evidence presented as part of the State's proofs" in the first trial. Ibid. "[I]f [the] defendant stipulates to the offense, the jury need be instructed only that [the] defendant was convicted of a predicate offense." State v. Brown, 180 N.J. 572, 585 (2004), overruled in part on other grounds by Bailey, 231 N.J. at 490. "When a defendant refuses to stipulate to a predicate offense under the certain persons statute, the State shall produce evidence of the predicate offense: the judgment of conviction with the unredacted nature of the offense, the degree of offense, and the date of conviction." Bailey, 231 N.J. at 490-91.

During Spraulding's certain persons trial, because Spraulding did not stipulate to a predicate offense, the State introduced into evidence two judgments of conviction for "possession with intent to distribute [(CDS)]." After instructing the jury that the State was required to prove (1) that Spraulding "purchased, owned or possessed or controlled the firearm on September 14, 2009," and (2) that Spraulding "is a person who has previously been convicted of a predicate offense[,]" the judge told the jury that, "[p]ursuant to our statute under the law," possession with intent to distribute CDS is a predicate offense, "but you do need to find those elements that I outlined for you beyond a reasonable doubt."

On appeal, Spraulding argues "[w]hen a defendant does not stipulate to the predicate offense, the jury must determine whether the defendant's prior conviction is an enumerated offense" and by "tak[ing] 'judicial notice' of this third element," the judge did not "allow[] the jury to find this element beyond a reasonable doubt." We disagree. The judge's instruction conformed to the model jury charge, which provides that "the State must prove beyond a reasonable doubt . . . that defendant is a person who previously has been convicted of a certain enumerated crime," not that the jury must determine whether the prior offense is a "certain enumerated crime" as a matter of law.

Model Jury Charges (Criminal), "Certain Persons Not to Have Any Firearms (N.J.S.A. 2C:39-7(b)(1))," at 5 (rev. Nov. 13, 2023).[10]

Instead, the model jury charge directs the judge to identify the alleged prior conviction as a predicate offense by stating:

> The statute specifically provides that "any person having been convicted in this State or elsewhere of the crime of [Select the enumerated crime listed in the indictment for the Certain Persons count and see footnote 5 supra] who possesses or controls a firearm is guilty of a crime." The term "convicted of the crime(s) of . . . " means evidence of a judgment of conviction entered by a court of competent jurisdiction in this State, New Jersey, or elsewhere.
>
> [Model Jury Charges (Criminal), "Certain Persons Not to Have Any Firearms (N.J.S.A. 2C:39-7(b)(1))," at 5 (rev. Nov. 13, 2023) (footnotes omitted).]

The referenced footnote five lists the enumerated crimes delineated in the statute.

Whether Spraulding was convicted of a certain offense was a factual question for the jury; that the specific offense was a predicate offense enumerated in N.J.S.A. 2C:39-7(b)(1) was a question of law subject to the

---

[10] Although an earlier version of the model jury charge would have been utilized for the trial, the applicable language is the same. See Model Jury Charges (Criminal), "Certain Persons Not to Have Any Firearms (N.J.S.A. 2C:39-7(b)(1))" (rev. Feb. 12, 2018).

court's determination. See State v. Schneiderman, 20 N.J. 422, 426 (1956) ("[Q]uestions of law are for the court's determination and are not within the province of the jury."). Thus, the judge did not err by instructing the jury that possession of CDS with intent to distribute was a predicate offense.

## V.

In Point IV of his brief, Byrd argues he was "denied the effective representation of counsel when his attorney literally did nothing to defend him" in his sequential certain persons trial. According to Byrd, counsel "offered no opening, no closing, and no evidence, and made no attempt to even ask the jury or the court for an acquittal."

"Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992); see State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991) ("Generally, a claim of ineffective assistance of counsel cannot be raised on direct appeal."). We adhere to our general policy and decline to entertain Byrd's ineffective assistance of counsel claim on direct appeal.

## VI.

In Point III of his brief, Jean-Baptiste argues the judge erred in permitting Spraulding's attorney and the prosecutor "to introduce other crime evidence through Pinto" over Jean-Baptiste's attorney's objection.

By way of background, during cross-examination of Pinto by Spraulding's attorney, Pinto testified that it was "unusual" for defendants to be "dressed in all black." Later, during re-cross-examination, the following questioning occurred between Pinto and Spraulding's attorney:

> [DEFENSE COUNSEL]: Now, you were talking about them wearing black gloves.
>
> [PINTO]: Yes.
>
> [DEFENSE COUNSEL]: You said that was unusual?
>
> [PINTO]: It wasn't . . . something that happened often, no, not at all.
>
> [DEFENSE COUNSEL]: But didn't you tell Detective Samis on December 8th, "They always wore black gloves"?
>
> [PINTO]: Yeah, but --
>
> [DEFENSE COUNSEL]: That's what you told him; is that correct?
>
> [PINTO]: But that's pertaining . . . . to certain situations, sir.
>
> [DEFENSE COUNSEL]: Did you tell him that they always wore black gloves; yes or no?

[PINTO]:  Yes.  That's out of context, sir.

The prosecutor requested a sidebar during which he asserted that the answer to the question was that defendants "always wore black gloves when they committed burglaries and robberies," and characterized defense counsel's questioning as "cherry-picking."  The judge confirmed that Spraulding's attorney understood that it was his "call" if he was "going to open that door."

On re-direct, the following exchange occurred between Pinto and the prosecutor:

> [PROSECUTOR]:      The other times that you saw [Spraulding] putting black gloves on, what was he doing?
>
> [PINTO]:   Um, I don't know what.  Um, it . . . wouldn't be like on a normal--they wouldn't put on gloves to do normal stuff, let's say.
>
> [PROSECUTOR]:      What type of stuff was [Spraulding] doing when he was putting black gloves [on]?  Specifically to [Spraulding].

Jean-Baptiste's attorney objected on the ground that the prosecutor was "leading" the witness and "trying to elicit a specific response."  The judge overruled the objection, noting that Spraulding's attorney made a "strategic defense decision . . . with regards to this" and that "what the prosecution has done at this point is just very narrowly focused this question on one of the three

. . . defendants."  After the sidebar, the prosecutor asked Pinto "what do you mean by not normal stuff?"  Pinto responded, "[F]or example, you could say illegal activities."

On appeal, Jean-Baptiste concedes the judge "was correct that [Spraulding's] counsel opened the door to prior bad acts."  Nonetheless, he contends the judge "failed to appreciate that Pinto's testimony about other crimes tainted [Jean-Baptiste]."

Otherwise inadmissible evidence may be admitted pursuant to the "opening the door" doctrine:

> The "opening the door" doctrine is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection.  The doctrine of opening the door allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence.  That doctrine operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context.
>
> [State v. James, 144 N.J. 538, 554 (1996) (citation omitted).]

However, "[t]he 'opening the door' rule has its limitations."  Ibid.

Under the related doctrine of "completeness,"

> [w]hen a witness testifies on cross-examination as to part of a . . . statement, . . . the party calling the witness is allowed to elicit on redirect examination "the whole thereof, to the extent it relates to the same subject matter and concerns the specific matter opened up." The theory behind the doctrine of completeness is "that the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance."
>
> [Id. at 554-55 (citations omitted) (first quoting Gov't of the Virgin Islands v. Archibald, 987 F.2d 180, 188 (3d Cir. 1993); and then quoting 7 Wigmore on Evidence § 2113, at 653 (Chadbourn rev. 1978)).]

Relatedly, "[t]he doctrine of 'curative admissibility' provides that when one party introduces inadmissible evidence, thereafter the opposing party may introduce otherwise inadmissible evidence to rebut or explain the prior evidence." Id. at 555 (emphasis omitted) (citing United States v. Nardi, 633 F.2d 972, 977 (1st Cir. 1980)). However, "[t]he doctrine applies only when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice." Ibid.

Our Supreme Court "has emphasized that the opening the door and curative admissibility doctrines can be used only 'to prevent prejudice,' and may not 'be subverted into a rule for [the] injection of prejudice.'" State v.

80

Vandeweaghe, 177 N.J. 229, 238 (2003) (alteration in original) (quoting James, 144 N.J. at 556). These doctrines allow for the introduction of otherwise inadmissible evidence "'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" Ibid. (quoting United States v. Winston, 447 F.2d 1236, 1240 (D.C. Cir. 1971)). Still, evidence is "subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence 'is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury . . . .'" James, 144 N.J. at 554 (omission in original) (quoting N.J.R.E. 403).

Spraulding's trial counsel sought to impeach Pinto's testimony that defendants wearing all-black was "unusual," with an earlier statement that was only inconsistent with her testimony if taken out of context. This easily could have misled the jury and prejudiced the State if the judge had not allowed the statement to be put in its proper context. Although Pinto's testimony that "they wouldn't put on gloves to do normal stuff" implicated all three defendants, the judge allowed the prosecutor to narrow the inquiry so that Pinto's statement about "illegal activities" was "specific[] to" Spraulding. In so doing, the judge mitigated the prejudice to Jean-Baptiste.

A-4941-18

Even if it was error for the judge to allow the questioning, the error was harmless. The admission of other-crimes evidence will be harmless where, as here, there is "overwhelming proof . . . of [the] defendant['s] guilt, independent of the other-crimes evidence." State v. Gillispie, 208 N.J. 59, 93 (2011). We also reject Jean-Baptiste's contention that the judge's "fail[ure] to provide any limiting instruction to the jury to protect [him] from the taint of Pinto's allegations" warrant "a new trial."

"Normally, a limiting instruction should be given by the trial judge sua sponte when 'other crime' evidence is admitted so that the jury will not give it greater scope than is justified." State v. Rajnai, 132 N.J. Super. 530, 537 (App. Div. 1975). However, "[t]he failure to give a limiting instruction does not necessarily require the reversal of a conviction." Ibid. Here, no request for such an instruction was made at trial and any instruction that Pinto's testimony only pertained to Spraulding would likely have drawn attention to the fact that Pinto had initially referred to all three defendants. Thus, under the circumstances, we do not believe the omission rises to the level of plain error. See R. 2:10-2.

## VII.

In Point IV of his brief, Jean-Baptiste argues that the judge abused his discretion by admitting statements by Pinto "as prior consistent statements

82

which served only to bolster [her testimony] . . . and thereby allowed impermissible other crimes evidence to be presented to the jury."

N.J.R.E. 803(a)(2) allows the admission of a statement previously made by a person who is a witness at a trial, provided that (1) it would have been admissible if made by the declarant while testifying, and (2) the statement: "is consistent with the declarant-witness' testimony and is offered to rebut an express or implied charge against the declarant-witness of (A) recent fabrication or (B) improper influence or motive." Thus, while "[a] prior consistent statement offered to bolster a witness' testimony is inadmissible[,] . . . a prior statement may be admitted in evidence to support the credibility of a witness for the purpose of rebutting an expressed or implied charge of recent fabrication." Palmisano v. Pear, 306 N.J. Super. 395, 402 (App. Div. 1997) (citations omitted).

However,

> [a]n attack on a party's credibility through prior inconsistent statements does not necessarily give plaintiff the right to use a prior consistent statement to buttress the party's credibility. Admitting such testimony is contrary to the traditional rule that parties may not bolster the credibility of their witnesses, unless the "attack upon the credibility of the witness tends to show that his testimony is a fabrication of recent date."

> [Id. at 403 (citation omitted) (quoting Sas v. Strelecki, 110 N.J. Super. 14, 22 (App. Div. 1970)).]

Similarly, a prior consistent statement may be admitted to rebut a claim of improper influence or motive. "[W]hether the statement was made before the asserted motive or influence to fabricate is a substantial factor in determining relevance" and admissibility under N.J.R.E. 803(a)(2), but it is not "absolutely controlling." State v. Muhammad, 359 N.J. Super. 361, 388 (App. Div. 2003). In State v. Chew, 150 N.J. 30 (1997), overruled in part on other grounds by State v. Boretsky, 186 N.J. 271, 284 (2006), "[o]ur Supreme Court . . . declined to adopt as a rigid admissibility requirement that the prior statement was made prior to the motive or influence to lie." Muhammad, 359 N.J. Super. at 386 (citing Chew, 150 N.J. at 81).

In Chew, 150 N.J. at 77, the defendant challenged the trial court's admission of prior consistent statements by two witnesses who inculpated him in a murder. The State moved to admit the statements after the witnesses were cross-examined on their motives and plea deals, and their credibility was heavily attacked. Id. at 77-78. When they initially spoke to police, the witnesses had provided the defendant with "an alibi." Id. at 77. Nine days later, "they both provided statements, largely consistent with their trial testimony, that inculpated [the] defendant." Ibid.

The Court concluded that the statements were properly admitted as prior consistent statements, id. at 81, reasoning that while the witnesses were aware that they were potentially facing charges when they made the inculpatory statements, "[t]here were shades of difference between the witnesses' motivation at different times," and "cross-examination tested whether the witnesses were further motivated by their plea agreements and whether the police had fed them with the details of their stories." Id. at 80. Under those circumstances, the Court determined that "[t]he prior consistent statements had significant 'probative force bearing on credibility beyond merely showing repetition.'" Id. at 81 (quoting United States v. Pierre, 781 F.2d 329, 333 (2d Cir. 1986)).

Here, the State moved to admit portions of Pinto's 2015 statements to police under N.J.R.E. 803(a)(2). The judge admitted the statements, reasoning that "Pinto provided multiple police statements prior to being charged with any crime and prior to her entry into a cooperation agreement." The judge pointed out that "defense counsel has charged that . . . Pinto should not be believed due to the fact that police bribed her, spoon-fed her information, or threatened her while she was pregnant which caused . . . Pinto to falsely implicate the three []defendants." The judge concluded "Pinto's prior consistent statements were

relevant to rebut the express and revised charges that . . . Pinto was bribed, [or] coached, to testify by police." We agree with the judge's ruling.

Jean-Baptiste contends "[t]he defense never indicated that Pinto had recently fabricated her testimony but rather . . . that she had been inconsistent, untruthful and unreliable from the beginning." On the contrary, defense counsel extensively cross-examined Pinto on her plea agreement, and argued in their opening and closing statements to the jury that Pinto's cooperation agreement with the State gave her a motive to lie. Defendants did not merely challenge Pinto's credibility by highlighting inconsistencies between her different statements. Instead, as Jean-Baptiste acknowledges in his brief, "[a]ll three defendants suggested that [Pinto] had a motive to implicate [defendants] because . . . she had received a favorable plea deal."

As in Chew, 150 N.J. at 77-81, Pinto gave the statements at issue before her cooperation agreement with the State underlying her alleged motive to lie came to fruition. Her statements were largely consistent with her trial testimony and thus of highly probative value bearing on her credibility. Pinto's statements were therefore properly admitted under N.J.R.E. 803(a)(2) "to rehabilitate" her credibility and rebut the defense claim that she had fabricated her story

inculpating defendants because of her cooperation agreement with the State. Chew, 150 N.J. at 80.

## VIII.

In Point VII of his brief, Jean-Baptiste argues the judge erred in denying his motion for a judgment of acquittal on count seven charging him with first-degree witness tampering pertaining to Pinto. Jean-Baptiste asserts "the State had failed to present sufficient evidence to satisfy the elements of first-degree witness tampering."

"Motions for a judgment of acquittal are governed by Rule 3:18-1," State v. Tindell, 417 N.J. Super. 530, 548 (App. Div. 2011), which provides in part:

> At the close of the State's case . . ., the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to warrant a conviction.
>
> [R. 3:18-1.]

However,

> a trial court must deny the defendant's motion if "'viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt.'"

A-4941-18

[State v. Ellis, 424 N.J. Super. 267, 273 (App. Div. 2012) (omissions in original) (quoting State v. Wilder, 193 N.J. 398, 406 (2008)).]

See also State v. Reyes, 50 N.J. 454, 458-59 (1967) (articulating the seminal standard of review for acquittal motions).

"On appeal, we utilize the same standard as the trial court in determining whether a judgment of acquittal was warranted." Ellis, 424 N.J. Super. at 273. However, "we apply a de novo standard of review," State v. Williams, 218 N.J. 576, 594 (2014), and "owe no deference to the findings of . . . the trial court," State v. Lodzinski, 249 N.J. 116, 145 (2021).

We have previously recited the witness tampering elements. Focusing on the requisite proofs to obtain a conviction for first-degree witness tampering, the State must prove that the defendant "employ[ed] force or threat of force" in connection with an investigation involving enumerated crimes, including those involved here. N.J.S.A. 2C:28-5(a). The key to whether a statement is a threat

> is the jury's appraisal of the context, as well as the content of a statement. Uttered in one context, an apparently innocent statement such as, "I'd be careful crossing the street if I were you" can be merely helpful advice to a senior citizen. Uttered in another context it may well be correctly perceived by reasonable persons to be intended as a threat.
>
> [State v. Crescenzi, 224 N.J. Super. 142, 147-48 (App. Div. 1988).]

A-4941-18

Here, after the close of the State's case, the judge denied Jean-Baptiste's motion for a judgment of acquittal on the first-degree witness tampering count, concluding that there was sufficient evidence to establish "threatened force" and "the potential to withhold testimony or information." Pinto had testified that Jean-Baptiste came to visit her at her home, which he had never done before. While an unknown third person drove them around, Jean-Baptiste told Pinto that he was trying to figure out who was "snitching" and urged her "to be quiet." Pinto testified that she took his statement as a threat "to be quiet or else." Viewing the State's evidence in its entirety and affording the State the benefit of all its favorable inferences, we are satisfied that a reasonable jury could find guilt of the charge beyond a reasonable doubt.

Jean-Baptiste argues that "Pinto's subjective opinion that she took defendant's request as a threat was not reasonable under the circumstances." Citing State v. D.A., 191 N.J. 158, 171 (2007), Jean-Baptiste asserts that "[g]enerally, where first-degree tampering has been charged, the threat has been explicit." Although there was an explicit threat in D.A., nothing in the Court's opinion suggests that a statement must be an explicit threat to qualify as a "threat of force" under the witness tampering statute. Id. at 166, 171. Rather, "an apparently innocent statement . . . . may well be correctly perceived by

A-4941-18

reasonable persons to be intended as a threat" in the proper context. Crescenzi, 224 N.J. Super. at 147-48. Here, viewed in context, there was sufficient evidence with which a jury could find beyond a reasonable doubt that Jean-Baptiste's statement to Pinto threatened violence. As such, the acquittal motion was properly denied.

IX.

In Point V of his brief, Jean-Baptiste argues the judge failed in his role "as the 'gatekeeper' to ensure juror impartiality and fairness." Specifically, Jean-Baptiste asserts the judge's failure "to excuse [J]uror 8 for cause and to voir dire the remaining jurors" after mid-trial allegations about Juror 8's damning extra-judicial "conduct and comments" came to light "was prejudicial error" warranting reversal of his convictions. In Point I of his brief, Spraulding makes the same argument, stressing "[d]espite defense counsels' objections, the voir dire of Juror 8 failed to specifically address the substantial allegations of her bias and misconduct, and no effort was made to determine if other jurors had been tainted by the views or conduct of Juror 8." In a supplemental brief, Byrd makes the same arguments.

By way of background, on February 19, 2019, during the trial, the judge informed counsel at sidebar:

90

There's been information that has been brought to certainly the [c]ourt's and counsel's attention with regard to Juror No. 8. It's my intention at this point to call her up, question her, see whether or not the answers to any of her initial jury questions have changed, and I also specifically want to find out where she works.

Spraulding's attorney asked the judge to "inquire about some of the specific allegations, especially that she talked to other jurors." Byrd's attorney specifically requested that every juror "be voir-dired to see if they have talked to [Juror 8]."

The allegations against Juror 8 were later recounted by the judge in a remand hearing ordered by this court. During the "temporary remand to reconstruct the record," the judge entered into the record emails regarding the allegations that prompted his inquiry received by court staff at approximately noon on February 19, 2019:

> [T]his is a series of emails that the [c]ourt had received with regards to this incident. The first email in this chain is the email from . . . [Byrd's attorney's secretary to the judge's secretary, Melissa]. [T]hat email is as follows. "Hi Melissa, to recap my conversation with you, I received a call from the public defender's office a few minutes ago. They received a call from an unidentified woman who told them she had information on one of the jurors. She knows the juror's name, but did not disclose it and said she would call back. Apparently, this woman has been Googling and texting [Byrd] and all of his friends. Stephanie from

the [Public Defender's (PD)] office is the one to speak
to, as she received the call."

According to the judge, his secretary forwarded the information by text to the court clerk, who then "called Stephanie at the PD's office and got more detailed information." Stephanie told the clerk that the caller "identified herself as Ms. Worthy (phonetic), but said she doesn't want to [get] involved any further. She claims she has a friend who works at Monmouth Medical Center" with a juror she "believe[d]" was "[J]uror number 15." The caller claimed the juror, whom she identified by name, "has been Googling the case, showing articles to and talking about it with other people and has already decided she's going to find them all guilty and going to burn their asses." The judge and counsel deduced that the allegations pertained to Juror 8, not Juror 15.

After discussing the matter with counsel on February 19, 2019, the judge called Juror 8 to sidebar and questioned her in counsels' presence as follows:

> [COURT:] At the beginning of this process we asked you a series of questions and those questions were designed to find out whether or not you could be fair and impartial.
>
> Is there anything that has happened throughout the course of this trial that would affect your answers to those questions?
>
> [JUROR 8:] No.

[COURT:]  Ma'am, where do you work?

[JUROR 8:]  At Monmouth Medical.

[COURT:]  Where do you live?

[JUROR 8:]  In Red Bank.

[COURT:]  Okay.  And in terms of any posting or newspaper articles, is there anything outside of what's been in this courtroom that you have been in contact with?

[JUROR 8:]  No.

[COURT:]  So is there anything that would change any of your other answers to those questions that we asked during voir dire?

[JUROR 8:]  No.

[COURT:]  And you believe that you can listen to the evidence in this case, and as I have asked you certainly throughout the voir dire process, listen to the evidence, apply the law as I give it to you at the end of the case and render a fair and impartial verdict?

[JUROR 8:]  I can.

[COURT:]  Okay.

[JUROR 8:]  Why do you ask?

[COURT:]  Because that's my job.

[JUROR 8:]  Okay.

[COURT:]  I ask the questions.  You don't.

What I want you to do is I want you to take your seat. This is a discussion, a private discussion, up at sidebar, the same as we did for jury selection.

[JUROR 8:] Okay.

[COURT:] I did that for a reason. I don't want you to discuss anything that we have talked about up here as we move forward. Okay?

[JUROR 8:] Okay.

[COURT:] You may be seated. Thank you.

The following colloquy regarding the voir dire ensued between the court

and counsel:

[COUNSEL FOR BYRD]: Judge, she confirms that . . . she works in Monmouth Medical. Quite frankly, I don't remember if she said that she's a nurse. Maybe someone could help me out.

[COUNSEL FOR SPRAULDING]: I can. She did when she was first questioned. That's how I knew she was No. 8.

. . . .

[COUNSEL FOR BYRD]: Judge, the [c]ourt didn't inquire as to whether she discussed this case at work with, you know --

[COURT]: I specifically asked her whether or not she had any outside information, anything outside of this courtroom. She said no, and I think the record should reflect that clearly she was puzzled why she would even

94

be up here answering these questions. In this Judge's opinion, she seemed very sincere and she seemed very straightforward with her answers. So in terms of further inquiry, I'm satisfied at this point.

. . . .

[COUNSEL FOR SPRAULDING]: . . . Judge. I ask that you excuse her for cause just because of what happened, and by that I mean bringing her up here by herself in the presence of the other jurors. She now has some thoughts in her mind about why she was singled out. I mean, I think . . . that's going to fester because she was asking you why am I here.

. . . .

[COUNSEL FOR JEAN-BAPTISTE]: I would ask that she be further questioned.

And the question being has she spoken to anyone at her job specifically about this case, I think that's a question that should be asked and I think it's innocuous enough.

[COURT]: Okay. I'm satisfied at this point with the inquiry that I have made. My concern is to make sure that we have a fair and impartial trial with fair and impartial jurors. I specifically asked her whether or not she had come into contact with any outside information. Her answer was no. And, as I indicated, she was about as candid and as straightforward as she could be; and . . . I specifically told her not to discuss anything that we discussed here at sidebar, so I'm satisfied at this point that we can move forward. This was an outside concern that was given originally to the Public Defender's Office, then brought to our attention. The person, as I understand the information to the Public

Defender's Office, originally had indicated that it was a different juror and then changed to Juror No. 8 and the information as I understood it had originally started out that this juror was texting Ebenezer Byrd and . . . his friends and clearly that couldn't happen because Mr. Byrd has been in custody for quite some time at this point without access to computers or texting or Facebook or any of those other things, so I'm satisfied at this point we can proceed.

At the remand hearing, the judge further explained:

Clearly, I did not want to taint the rest of the jury with regards to something that may certainly have been all fabricated. We may never know who Ms. Worthy is. She was never part of this trial, never listed, as I understand it, on any of the witness lists, that name is foreign to me, had not heard it prior to haven't heard it hence. And with that, I chose the course that I chose to question . . . only the individual juror.

There was some discussion about the way and manner it should have been done, whether or not she should have been called into my chambers, which throughout the course of my career I have never done and certainly did not want to start it with this case.

I think [J]uror number 8 was clear and unequivocal. She seemed to my recollection puzzled as to why she was there. She made it clear to this [c]ourt that she could be fair and impartial, and that she could listen to the testimony and apply the law as I gave it to her at the end of the case.

. . . . The allegation simply was that she had been texting and talking about the case, and I was satisfied based on her candid response to my questions that that had not happened.

96

A-4941-18

"A criminal defendant's 'constitutional right to be fairly tried by an impartial jury' is protected by both the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution." State v. Dangcil, 248 N.J. 114, 140 (2021) (quoting State v. Little, 246 N.J. 402, 414 (2021)). "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001); see Sheppard v. Maxwell, 384 U.S. 333, 362 (1966) (stating that due process requires accused receive trial by impartial jury free from outside influence); State v. Williams, 93 N.J. 39, 60 (1983) (same).

"Common sense dictates that jurors should be shielded from any external factor that might induce bias or prejudice, and therefore destroy the impartiality necessary for a fair trial." State v. Loftin, 191 N.J. 172, 189 (2007). Yet, as the United States Supreme Court has noted, due process does not require the trial court to

> shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

[Smith v. Phillips, 455 U.S. 209, 217 (1982).]

In cases of "mid-trial allegations of jury misconduct[,] . . . the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality." State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997). "Although the trial judge has discretion in the way to investigate allegations of jury misconduct, an adequate inquiry on the record is necessary for the purposes of appellate review." Id. at 488.

In R.D., our Supreme Court provided the following guidance to trial courts addressing mid-trial juror irregularities:

> The court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary.
>
> [169 N.J. at 558 (citation omitted) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:16-1 (2000)).]

In particular, the trial court should ask the juror about

> the specific nature of the extraneous information, and whether the juror intentionally or inadvertently has

imparted any of that information to other jurors. Depending on the juror's answers to searching questions by the court, the court must then determine whether it is necessary to voir dire individually other jurors to ensure the impartiality of the jury. . . . Although the court should not simply accept the juror's word that no extraneous information was imparted to the others, the court's own thorough inquiry of the juror should answer the question whether additional voir dire is necessary to assure that impermissible tainting of the other jurors did not occur. In some instances, the court may find that it would be more harmful to voir dire the remaining jurors because, in asking questions, inappropriate information could be imparted.

[Id. at 560-61.]

"It is the duty of the court to ask probing questions to protect the impartiality of the jury." Id. at 563.

Ultimately, the trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.

[Id. at 559.]

"[A] juror who has formed an unalterable opinion of the defendant's guilt or innocence must be excused from service on the panel." Loftin, 191 N.J. at 187 (citing Williams, 93 N.J. at 61). "[A]ll doubts about a juror's integrity or

ability to be fair should be resolved in favor of removing the juror from the panel." Ibid. Additionally, "a new trial will be granted when jury misconduct or the intrusion of irregular influences into jury deliberations 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" Scherzer, 301 N.J. Super. at 486 (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)). "The test is 'not whether the irregular matter actually influenced the result but whether it had the capacity of doing so.'" Ibid. (quoting Panko, 7 N.J. at 61).

"The abuse of discretion standard of review" applies "when reviewing . . . determinations of a trial court" in the handling of juror irregularity. R.D., 169 N.J. at 560. "We traditionally have accorded trial courts deference in exercising control over matters pertaining to the jury" and application of the abuse of discretion standard "respects the trial court's unique perspective." Id. at 559-60; see United States v. Cantu, 167 F.3d 198, 202 (5th Cir. 1999) (applying abuse of discretion standard of review to trial court's decision not to voir dire remaining jurors).

Applying these principles, we discern no abuse of discretion in the judge's handling of the allegations pertaining to Juror 8. Critically, the judge confirmed that Juror 8 was able to "listen to the evidence," "apply the law" as instructed at

the end of the case, and "render a fair and impartial verdict."  Relying on his own "objective evaluation of the potential for prejudice rather than on the juror['s] subjective evaluation of their own impartiality," the judge was satisfied that the juror could render a fair and impartial verdict.  Scherzer, 301 N.J. Super. at 487-88 (stressing that in questioning a juror to assess taint, the judge must determine "whether the juror is capable of deciding the case impartially, based solely on the evidence presented at trial").

In determining that the voir dire was sufficient, the judge considered that the allegations may "have been all fabricated."  The judge noted that an anonymous caller had originally claimed "that this juror was texting Ebenezer Byrd" which "couldn't happen because Mr. Byrd ha[d] been in custody for quite some time."  Based on the source and the contents, the judge was understandably skeptical about the allegations.

Although New Jersey courts have not squarely addressed the issue, we believe that less credible allegations of juror misconduct necessitate a less extensive inquiry.  Courts in other jurisdictions have observed that not all claims of juror misconduct even necessitate an inquiry by the trial court.  See Sulcov v. 2100 Linwood Owners, 303 N.J. Super. 13, 30 (App. Div. 1997) (noting that

"[a]bsent New Jersey precedent, it is appropriate to look to out-of-state cases for guidance").

For example, in United States v. Zimny, the court stated:

> We recognize the danger that a criminal defendant or someone acting on a defendant's behalf might author an anonymous posting on the internet while posing as a juror in the hopes of delaying the finality of the conviction, and we by no means require a district court judge to automatically undertake an inquiry every time an anonymous posting authored by someone claiming to be a juror surfaces.
>
> [846 F.3d 458, 470 (1st Cir. 2017).]

Similarly, in State v. Brown, 668 A.2d 1288, 1305 (Conn. 1995), the Supreme Court of Connecticut stated that "[t]he more obviously serious and credible the allegations [of jury misconduct], the more extensive an inquiry is required; frivolous or incredible allegations may be disposed of summarily." The court explained:

> A proper assessment of the credibility of the allegations will require the trial court to weigh the source of the allegations. Allegations made by identifiable and reliable sources, such as court personnel and jurors, are presumably entitled to more credit than are similar allegations made by an anonymous source. At the same time, however, corroboration and other indicia of reliability may enhance the credibility of even anonymous allegations.
>
> [Ibid.]

102

At issue in Brown was a letter that, "[a]lthough written anonymously," the court determined "required a sua sponte preliminary inquiry by the trial court specifically addressing whether the allegations required an investigation or other response." Id. at 1302. The court reasoned that the anonymous letter had some indicia of reliability: it "was accurately addressed to the judge who had presided over the defendant's trial and contained accurate information about the defendant and the charges involved," as well as "specific and facially credible allegations of jury exposure to racially derogatory remarks regarding the defendant allegedly made by court officials." Ibid. Moreover, the letter "named as the source of these allegations a person who was accurately identified as a juror." Ibid.

Although Brown is not controlling, we believe the reasoning that an investigation may be more or less extensive depending on the relative credibility of the allegations is persuasive and implicit in affording trial courts "discretion in the way to investigate allegations of jury misconduct." Scherzer, 301 N.J. Super. at 488. Brown's reasoning is particularly apt in a trial involving witness tampering charges, as here.

The judge's skepticism about the allegations was reasonable. The caller gave a name but did not identify herself in any way that would allow her identity

to be confirmed.  The source of the allegation, a co-worker of the juror, was not named and thus could not be independently verified.  The caller made two seemingly conflicting claims of misconduct, first that the juror was in communication with Byrd and his friends, which would suggest that the juror was aligned with defendants in some way, and then that she had pre-determined that defendants were guilty, had read articles online, and had discussed the case with others.

The only verifiably accurate information the caller gave, the juror's name and place of work, was ascertainable by anyone sitting in the courtroom during jury selection.  Under the circumstances, once the judge asked Juror 8 whether she had seen any media reports about the case, and found her denial and puzzlement sincere, it was a reasonable exercise of discretion to not delve further into non-credible allegations.  We are satisfied the judge properly exercised his discretion by weighing the relevant factors and applying the proper balance between them.

## X.

In Point VIII of his brief, Jean-Baptiste argues the errors asserted on appeal cumulatively deprived him of a fair trial "as each error compounded the effect of the next."

 A-4941-18

"[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." Jenewicz, 193 N.J. at 473. However, "[i]f a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014). "When assessing whether defendant has received a fair trial, we must consider the impact of trial error on defendant's ability fairly to present his defense, and not just excuse error because of the strength of the State's case." Jenewicz, 193 N.J. at 473.

Still, "[t]he standard for review of a trial is neither as stringent nor as unforgiving as defendant asserts." State v. Wakefield, 190 N.J. 397, 537 (2007).

> Trials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."
>
> [State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).]

Although Jean-Baptiste's trial was not perfect, we are satisfied that, on the whole, it was fair and "[o]ur obligation is to ensure that defendant had a fair trial." Jenewicz, 193 N.J. at 473.

In Points V, IX, and V of their respective briefs, Byrd, Jean-Baptiste, and Spraulding challenge their sentences as excessive.[11]

Our sentencing standard of review is well established. We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under New Jersey's penal code, "a sentencing court first must determine, pursuant to N.J.S.A. 2C:44-1(a) and (b), whether aggravating and mitigating factors apply. After balancing the factors, the trial court may impose a term

---

[11] Although Byrd's point heading in his brief states that "the sentence imposed is manifestly excessive," he does not present or suggest any argument to this effect. An issue not briefed on appeal is deemed waived. Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

within the permissible range for the offense."  State v. Bieniek, 200 N.J. 601, 608 (2010).  "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range."  Case, 220 N.J. at 64-65 (alteration in original) (quoting State v. Natale, 184 N.J. 458, 488 (2005)).

In State v. Yarbough, 100 N.J. 627 (1985), our Supreme Court established guidelines for sentencing courts imposing consecutive sentences for multiple offenses pursuant to N.J.S.A. 2C:44-5(a).  Factors to be considered include whether "the crimes and their objectives were predominantly independent of each other;" whether "the crimes involved separate acts of violence or threats of violence;" whether "the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;" whether the crimes involved "multiple victims;" and whether "the convictions for which the sentences are to be imposed are numerous."  Id. at 643-44.

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory range."  State v. Abdullah, 184 N.J. 497, 514 (2005).  The facts relating to the

crimes "should be applied qualitatively, not quantitatively," and consecutive sentences may be imposed "even though a majority of the Yarbough factors support concurrent sentences." State v. Carey, 168 N.J. 413, 427-28 (2001); see also State v. Molina, 168 N.J. 436, 442 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims").

In Abdullah, the Court reminded trial judges "that when imposing either consecutive or concurrent sentences, '[t]he focus should be on the fairness of the overall sentence,' and that they should articulate the reasons for their decisions with specific reference to the Yarbough factors." 184 N.J. at 515 (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). In State v. Torres, the Court directed that when imposing lengthy consecutive sentences, "an explanation for the overall fairness of a sentence by the sentencing court is required" in order to curtail and, if necessary, correct "'arbitrary or irrational sentencing.'" 246 N.J. 246, 272 (2021) (quoting State v. Pierce, 188 N.J. 155, 167 (2006)). Thus, consideration of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis" and, ordinarily, a limited remand is required when such an explanation is not provided. Cuff, 239 N.J. at 352.

A-4941-18

As to Byrd, after appropriate mergers, the judge imposed an aggregate sentence of one-hundred and twenty years, with a parole ineligibility period of eighty-three and three-quarter years. The sentence is comprised of a life sentence for felony murder, and two consecutive twenty-year terms, each with a ten-year parole disqualifier, for two counts of first-degree witness tampering, and a consecutive five-year term for third-degree witness tampering. N.J.S.A. 2C:28-5(e) mandated consecutive sentencing on the three witness tampering counts. The sentences on all other counts not merged were concurrent to the murder conviction.

Byrd argues the judge failed to make a statement explaining the overall fairness of his aggregate sentence, mandating a remand for resentencing. Not so. In imposing sentence, the judge stated:

> The aggregate sentence that has been imposed by this [c]ourt is [120] years, 83 and three-quarters years needs to be served before Mr. Byrd will be eligible for parole.
>
> . . . .
>
> This [c]ourt's hope and expectation is that this defendant will spend the rest of his natural life locked safely and securely behind the walls of a correctional facility. Today's sentence closes a tragic chapter in Monmouth County's story and history. With today's sentencing, a trio of career criminals will die in the custody of the Commissioner of the Department of Corrections. Their crime spree, which spans over 28

A-4941-18

years, is over. Together they account for 44 juvenile adjudications, 32 municipal court convictions, and 32 municipal court offenses.

I would like to think . . . that today's day of reckoning and these cumulative sentences of over 305 years will serve as a deterrence to future generations. Only time will tell. What I do know is that a beautiful young lady was brutally and senselessly murdered. What I do know is that her family, friends, colleagues, and students' lives will never be the same.

After appropriate mergers, Jean-Baptiste was sentenced to life in prison, subject to NERA, for felony murder, and a consecutive twenty-year sentence, with a ten-year period of parole ineligibility, for first-degree witness tampering as required under N.J.S.A. 2C:28-5(e). He received concurrent sentences on counts that did not merge, but his aggregate sentence was consecutive to sentences he was already serving on unrelated indictments.

At sentencing, the judge recounted Jean-Baptiste's extensive criminal history, particularly his juvenile adjudications, his adult convictions, his conviction dates, his sentences, and the fact that this was his tenth indictable conviction as an adult. Based on the risk of re-offense, the extent of defendant's prior criminal record, and the need for deterrence, the judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge

found no mitigating factors applied, and concluded the aggravating factors substantially outweighed the non-existent mitigating factors.

Specifically, the judge explained:

> With regards to the instant offense, and clearly the reason that I bring this criminal history, because that is something that I need to weigh and balance as I come up with an appropriate sentence for this offense. I do find aggravating factors 3, 6 and 9. I do not find any mitigating factors. There is none that I find that are applicable to this offense.
>
> Clearly, and [defense counsel] does indicate that nothing was of violence in his prior history, mostly drug-related offenses, so to the extent that that was an argument for mitigating factor number 7, the [c]ourt does not find that. Clearly, there is a lengthy criminal history dating back to when he was a juvenile and that history has continued throughout his adult years.

In support of imposing a sentence that was consecutive to the unrelated sentences Jean-Baptiste was already serving, the judge reasoned:

> Clearly, there's no question that this is a separate and distinct offense [from] those offenses that he's currently serving state prison time [for]. No question . . . , and I certainly find the victims and all the factors are completely different in this offense than the ones that he's currently serving the time for.

The judge also considered the overall "length of [the] sentences imposed" and concluded that it was "reasonable in light of the credible evidence in the record."

Jean-Baptiste argues the judge "failed to provide any analysis for the finding of the aggravating factors." He also asserts "the imposition of multiple consecutive sentences resulted in a manifestly harsh and draconian sentence." He contends "a resentencing remand should be granted" to allow the court to consider his age at the time of the offense as a mitigating factor pursuant to N.J.S.A. 2C:44-1(b)(14). We reject each of these contentions.

First, we are satisfied the judge set forth reasons for defendant's sentence with sufficient clarity and particularity and made findings that are amply supported by competent and credible evidence in the record. Defendant's sentence was in accord with the sentencing guidelines, was based on a proper weighing of the factors, and does not shock the judicial conscience.

Second, N.J.S.A. 2C:44-1(b)(14), which took effect on October 19, 2020, allows the sentencing court to consider as a mitigating factor whether "[t]he defendant was under 26 years of age at the time of the commission of the offense." Although Jean-Baptiste was twenty years old when the crimes were committed, our Supreme Court has held that N.J.S.A. 2C:44-1(b)(14) "appl[ies] prospectively only." State v. Lane, 251 N.J. 84, 96 (2022). Thus, because Jean-Baptiste was sentenced on May 30, 2019, "prior to the provision's effective date," N.J.S.A. 2C:44-1(b)(14) does not apply to him. Id. at 87.

After appropriate mergers, Spraulding was sentenced to life in prison, subject to NERA, for felony murder. He received concurrent sentences on counts that did not merge. The judge recounted Spraulding's "extensive criminal history," consisting of "four prior juvenile matters, [twelve m]unicipal [c]ourt matters," ten prior indictable convictions in New Jersey, and "a [prior] conviction in Maryland." Based on the risk of re-offense, the extent of defendant's prior criminal record, and the need for deterrence, the judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge found no mitigating factors applied, and concluded the aggravating factors substantially outweighed the non-existent mitigating factors.

In support, the judge explained "[t]he length of the sentence imposed" was "determined by the [c]ourt's assessment of the aggravating and mitigating factors, including the consideration of the deterren[ce] needed to protect the public." The judge elaborated:

> I had an opportunity to go through the mitigating and aggravating factors. I find that there are aggravating factors number three; clearly the likelihood that this defendant will commit another offense; aggravating factor number six, the extent of the defendant's prior criminal record and the seriousness of the offense of which he has been convicted; and finally, aggravating factor number nine, the need to deter this defendant and others from violating the law.

Looking at all of the mitigating factors and giving Mr. Spraulding the benefit of all of the reasonable doubts, I do find no mitigating factors in this case. I do find that this crime was especially heinous, certainly an innocent woman by all measure and means and everything before this [c]ourt, certainly a God-fearing woman, contributing positive things to her community and clearly I can't even say wrong place, wrong time. She was home sleeping and doing exactly what she was supposed to be doing, getting ready for her next day at school, and clearly the intended victim of this was an apartment next door. . . . [C]ertainly Ms. Melton was innocent by every stretch of the imagination and clearly it was horrific and the horror that she must have felt as this heinous offense unfolded was unimaginable.

Spraulding argues the judge "failed to explain [his] finding of aggravating factors and imposed an excessive sentence." On the contrary, applying our deferential standard of review, we are satisfied the sentence was in accord with the sentencing guidelines, was based on a proper weighing of the factors, and does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4941-18